COLONELL v. GOODMAN et al.

Civ. A. No. 6671.

District Court, E. D. Pennsylvania.

Feb. 26, 1948.

John J. Gain, of Philadelphia, Pa., for plaintiff.

Schnader, Kenworthey, Segal & Lewis, of Philadelphia, Pa., for defendants exclusive of David H. Pleet.

Harry Shapiro, of Philadelphia, Pa., for David H. Pleet.

KIRKPATRICK, District Judge.

The plaintiff brought this action upon a contract by which, as he alleges, he was promised, for services in connection with the sale of the business of Parkway Oil Company, one of the defendants, a commission of five per cent upon the sale price.

The case was tried to the Court with a jury. The verdict was for the plaintiff and against all the defendants except David Pleet. The other defendants have filed a motion for judgment under Federal Rules of Civil Procedure; Rule 50(b), 28 U.S.C.A. following section 723c, and also an alternative motion for a new trial.

The following is the substance of the plaintiff's case:

From 1937 until 1945 he was in the employ of American Oil Company as sales manager in charge of sales for Pennsylvania and six other states.

In 1939 and 1940 Parkway Oil Company, which operated a number of service stations in Philadelphia, was under contract with American to buy all its oil and gasoline from the latter. It was not, however, an exclusive distributor.

The plaintiff, beginning in the early part of 1939, in pursuance of his duties as sales manager for American, had numerous contacts and interviews with Goodman, the president of Parkway, in the course of which he made a number of suggestions for the improvement of its business and gave advice and assistance. During 1939 and the early part of 1940, the possibility of the plaintiff's leaving American and becoming interested in Parkway, either as a part owner or as an employee, was discussed. There never was any definite agreement but the plaintiff had some reason to think that the talk would lead to one.

In February or March, 1940, the plaintiff told Goodman that if he was to become financially interested in Parkway he would want it to have an exclusive distributorship and suggested that the Texas Company, a competitor of American, was the logical concern to negotiate with, adding that he was acquainted with a number of the Texas Company officials. Goodman agreed and authorized him to see the Texas Company with a view to obtaining an exclusive distributorship from it.

The plaintiff went to New York where he interviewed one of the Texas vice-presidents and learned from him that Texas would not give an exclusive distributorship. However, in view of what was said at the interview, he came to the conclusion that Texas might be interested in purchasing Parkway and, on his return to Philadelphia, so advised Goodman. He, however, pointed out to Goodman that if Texas should buy Parkway there would be no possibility of his obtaining an interest in or employment with Parkway, whereupon Goodman promised him that if a sale to Texas should be consummated he would receive a commission of five per cent. At the same time Goodman told the plaintiff that he, Goodman, would handle all future negotiations with the Texas Company.

Thereafter from time to time over a period of more than a year, Goodman told the plaintiff that he was in contact with Texas and, although the plaintiff did not himself have any further direct dealings with Texas, he assisted Goodman in preparing data of various kinds to submit to Texas, showing the value of the Parkway properties and its financial position, and also advised Goodman as to the proper method of approach and what steps to take in the conduct of the negotiations.

At the end of 1941, the war caused a suspension of all further efforts to sell until the latter part of 1944, at which time Goodman told the plaintiff that Texas was again interested. Goodman reiterated his promise to pay the five per cent commission and the plaintiff resumed his activities in connection with the negotiations which consisted, as before, of advice and assistance to Goodman without any direct dealing on the plaintiff's part with Texas.

In June, 1945, the plaintiff learned through a third party that Parkway had been sold to Texas and went to see Goodman who confirmed the news and also told the plaintiff that he would not get any commission.

The foregoing facts, which represent the evidence in its most favorable light to the plaintiff, present the case of an important official of a corporation, entrusted particularly with the promotion and maintenance of sales, who, without his employer's knowledge, sets about detaching one of his employer's largest customers and endeavoring to give its business to one of his employer's competitors, his purpose being to improve the business position of the customer with which he hopes (though without any definite assurance) to associate himself. When it appears that the competitor may be interested in purchasing the customer's business outright, he informs the customer of that fact, makes a contract with the customer to receive a commission

on the sale and thereafter continues to advise and consult with the customer in the negotiations until the sale is consummated.

As to the nature of the cause of action; the plaintiff, in his complaint and consistently throughout the trial, maintained that the action was by an agent to recover a commission, under an express contract by which it was agreed that if a sale of the property was effected the commission would be paid in consideration of the agent's having brought the purchaser to his principal, the understanding being that the plaintiff's right to his commission would accrue when the sale was made, without regard to how or by whom the result was finally accomplished. In view of the large amount of the commission claimed and the comparatively small amount of work done by the plaintiff, as well as of the fact that the work had been done when the promise was made, the Court in the course of the trial, in conference with counsel, suggested that the plaintiff might be basing his action not on a claim for commission as such but on a promise of compensation in return for his failure to receive an interest in Parkway. This theory was expressly repudiated by plaintiff's counsel and the case was argued by counsel and submitted to the jury on the sole theory that the plaintiff was claiming an agent's commission on a sale.

The plaintiff, as a managing official or executive of a corporation, owed it a fiduciary as well as a contractual duty. "An agent is a fiduciary with respect to matters within the scope of his agency.", Restatement, Agency, Sec. 13.

" * * * any bargain that tends to induce a violation of a fiduciary's duty as such, is illegal except when effectively consented to by the beneficiary or principal * * *", Restatement, Contracts, Sec. 570. Broad considerations of public policy condemn such contracts.

It can hardly be asserted, nor could a jury find, that a promise by a third party to compensate a sales manager of a corporation for his services in taking a large customer away from his employer is not one that tends to induce a violation of his duty. A bargain which, it seems to me, was less clearly against the employer's interest and not so great a deviation from the employee's duty as that in the present case put the plaintiff out of court in Pollock v. MacElree, D.C., 56 F.Supp. 961, 963, Judge Kalodner observing "Obviously the Court should not assist the plaintiff to profit in this unconscionable transaction." Reiner v. North American Newspaper Alliance, 259 N.Y. 250, 181 N.E. 561, 564, 83 A.L.R. 23, was a bargain which committed the plaintiff to a breach of his contract with a third person, but the opinion of Judge Crane contains a statement of public policy transcending the precise situation before the Court. He said, "Fraud, deceit, breach of trust, are general terms covering divers situations and circumstances, and seldom yield to definition or limitation; in other words, the facts differ in every case, but the principle remains the same."

It is true that, as stated in Sec. 393(e), Restatement, Agency, that an employee who expects to terminate his employment may, before the close of his employment, make certain arrangements to establish himself in a new business, even with a view toward competing with his employer. "He may not, however, before the termination of his employment, solicit customers for such rival business, nor may he do other similar acts in direct competition with the employer's business.", Restatement, Agency, Sec. 393(e). I do not believe that the plaintiff in the present case, even during the time when he had some prospect of becoming associated with Parkway, was justified in working, without his employer's knowledge, to switch Parkway's business from his employer to a competitor. However, that question is really not in the case because when he concluded, after his first interview with the Texas people, that they would not give Parkway a distributorship and made up his mind to advise Parkway of a possible sale and to do what he could to promote the sale, he ceased to be an employee planning to terminate his employment and became an employee working for compensation against his employer's interests.

848

There was some rather equivocal testimony on the part of the plaintiff to the effect that American was not greatly interested in retaining Parkway as a customer.[1] In view of the facts that no witness was called to substantiate this testimony, that American renewed its contract with Parkway, after the plaintiff made his contract with Goodman, for a further period of three years during which period American could have cancelled on six months' notice but did not, and the further fact that the plaintiff did not advise American of what he was doing (and in fact made some effort to conceal it by directing Texas to write him at his home address), no finding could have been made that his violation of duty was "effectively consented to by the beneficiary or principal of the fiduciary." Restatement, Contracts, Sec. 570. Beyond all this, however, it is to be remembered that the rule is a prophylactic one. "Actual injury is not the principle the law proceeds on, in holding such transactions void." Lum v. McEwen, 56 Minn. 278, 57 N.W. 662. "'* * * the rule is not intended to be remedial of actual wrong, but preventive of the possibility of it.'" Everhart v. Searle, 71 Pa. 256.

■ Out of what appeared to the Court an abundance of caution, the defendants at the close of the plaintiff's case offered an amendment to the answer, specifically raising the defense of illegality. The Court allowed the amendment but the defense could have been made just as well without it. "Thus, although illegality is an affirmative defense, if the illegality appears on the face of the contract, or from the opening statement of plaintiff's counsel, or from plaintiff's proof, the defendant could take advantage of it by proper motion, and if necessary the court will raise the objection itself.", Moore's Federal Practice, General Rules of Pleading, Vol. 1, page 568. In Fitzsimons v. Eagle Brewing Co., 3 Cir., 107 F.2d 712,

713, 126 A.L.R. 681, the defense of illegality was not pleaded at all. The trial court acted of its own motion in entering judgment for the defendant upon that ground, and the Circuit Court of Appeals said, "* * * the defense of illegality was not interposed by a welsher but, as was not only proper but necessary, by the court sua sponte."

Summing up, "The law leaves the plaintiff to be judged by his own standards; his complaint that the defendant treated him as he treated others falls upon deaf ears; the law is silent; it has nothing to say." Reiner v. North American Newspaper Alliance, supra.

■ Judgment may be entered for the defendants on this motion under Rule 50(b).

Sur Defendants' Motion for New Trial

Following the practice outlined by the Supreme Court in Montgomery Ward v. Duncan, 311 U.S. 243, 61 S.Ct. 189, 85 L.Ed. 147, this Court will rule upon the motion for a new trial, the ruling being in the alternative and effective only if there should be a reversal after the entry of judgment n. o. v.

The alternative motion for a new trial must be granted, for the reason that the verdict was directly contrary to the Court's instructions to the jury.

The Court was of the opinion that no verdict could be rendered against the defendants Benjamin Goodman and William Pleet because it seemed perfectly clear that, in making the contract, they had acted merely as agents for a disclosed principal. The Court was also of the opinion that the evidence showed that, in so doing, they had acted either for the corporation, Parkway Oil Co., or for its stockholders, Mrs. Pleet, Mrs. Goodman and David H. Pleet, as individuals, and that, under the evidence, the jury could not find that they had acted as agents for both the corpora-

[1] He said at first that "they didn't want this customer" but subsequently testified that "they weren't so much interested in their (Parkway's) business" and again that "They weren't overly interested." In his deposition he testified that "* * * I thought that the American would insist that the Parkway live up to the agreement and that I doubted seriously whether American would release the contract to a competitor at a sooner date."

tion and the stockholders. The Court, therefore, instructed the jury that if their verdict should be for the plaintiff it would have to be against either the corporation or the stockholders but not against both, and that in any event the verdict would have to be in favor of Benjamin Goodman and William Pleet.

The jury first returned with a verdict in favor of the plaintiff and against the corporation only; as between the plaintiff and the various individual defendants, no verdict was returned. The Court called the jury's attention to this and after some discussion concluded that the jury had intended to render a verdict in favor of the individual defendants, and the Court was about to take the verdict in that form when counsel for the plaintiff intervened and suggested that the jury might have in mind rendering a verdict against William Pleet, Benjamin Goodman and also against Mrs. Pleet and Mrs. Goodman. On questioning the jury the Court felt that there was some doubt as to just what the jury intended the verdict to be and sent them back for further deliberation, reiterating the instruction that they could not find against both the corporation and the stockholders.

In spite of this, the jury returned in less than an hour with a verdict against all the defendants except David H. Pleet.

■ I do not think that the Court's instructions to the jury were erroneous but, right or wrong, the refusal of the jury to find in accordance with them necessitates the award of new trial. "Nonconformity of the verdict to the judge's charge is ground for a new trial, according to the weight of authority, regardless of the showing as to whether the instructions were right or wrong. Even if erroneous, they constitute the law governing the case, and it is the duty of the jury to follow them. Any other rule, it is said, would lead to endless confusion, sanctioning disregard of the court's opinion of the law applicable to the pleadings and the evidence, and rendering its instructions impotent except where willed otherwise by the jury.", Am.Jur., New Trial, Sec. 127.

There have been exceptional cases in which verdicts in disregard of clearly erroneous instructions have been allowed to stand. Such a case was Lazier Gas Engine Co. v. Du Bois, 3 Cir., 130 F. 834, 839. The facts of that case make it clear that, as the Court said, " * * * it would be a sacrifice of justice for no good purpose to set aside such a verdict on the ground that the jury had disregarded the instructions of the court in rendering it." The present case is not such a one. The stockholders who were sued as defendants are not now and were not when the action was commenced stockholders of the corporation, and from the verdict it is impossible for the Court to tell against which judgment should be entered.

The motion for a new trial in the alternative is granted.