HARTMAN v. WHITE MOTOR CO.

No. 1649.

United States District Court
W. D. Michigan, S. D.

Feb. 5, 1952.

Paul E. Cholette and Alexander, Cholette, Buchanan, Perkins & Conklin, all of Grand Rapids, Mich., for plaintiff.

Leon W. Harrington and Harrington, Waer, Cary & Servaas, all of Grand Rapids, Mich., for defendant.

STARR, District Judge.

In this case the jury returned a verdict for the plaintiff and assessed his damages at $10,096.08. The defendant has moved for judgment in its favor notwithstanding the verdict or, in the alternative, for a new trial. In discussing this motion it is deemed advisable to set forth briefly the facts involved in the case.

For several years prior to January 4, 1950, plaintiff Hartman had been the distributor for defendant motor company in Grand Rapids and several counties in western Michigan. On January 4, 1950, the parties mutually agreed to terminate this distributorship and to subsequently settle all accounts between them. As a result of preliminary negotiations the defendant, by letter dated March 24, 1950, made plaintiff an offer of settlement, the pertinent provisions of which were as follows:

"We (White Motor Company) will pay Mr. Hartman the sum of $3,000 in full settlement of all accounts in exchange for a general release by Mr. Hartman of all claims of every nature and description against The White Motor Company but

with a stipulation of three matters that are still to be worked out between the parties. These three matters are as follows:

"1. The White Motor Company will pay the regular bonus of $127.95 upon the delivery to Mr. Hartman of a truck which he has ordered for Mr. Mino Buck, provided Mr. Hartman takes delivery of that truck and pays for the same by May 1, 1950.

"2. Mr. Hartman is to deliver to us at Grand Rapids both of the 5 ft. Neon signs that have been under discussion.

"3. Immediately upon completion of a physical inventory of the stock of White parts in Mr. Hartman's possession, this inventory to be taken by the parts men of The White Motor Company, and upon due compliance by Mr. Hartman with the Bulk Sale Law of the State of Michigan, The White Motor Company will purchase that stock of parts, but only such portion thereof as was included in the inventory that was taken of the same in January 1950, upon the basis of The White Motor Company's current prices to distributors less a handling charge of 5%, these parts to be delivered to The White Motor Company at Grand Rapids.

"As a part of the settlement offered, we must also receive a separate general release from Mr. Hartman of all claims of every nature and description against Mr. Kadow.

"In connection with the purchase of the stock of parts it must be agreed that our obligation to repurchase them will not be binding upon us unless Mr. Hartman proceeds immediately and with dispatch in effecting a compliance with the Bulk Sale Law."

Plaintiff Hartman, by a letter dated March 28, 1950, from his attorney to defendant's attorney, accepted the defendant's offer. This letter read as follows:

"We acknowledge receipt of your most recent letter enclosing copies of the correspondence from White Motor Company.

"Your proposition is acceptable. We would like however to know whether the item numbered 2 with reference to the neon signs calls for the payment of $118 as previously agreed upon or whether that is to be included in the $3,000. It is our understanding with reference to item No. 3 that the amount to be paid is based upon the inventory upon current prices less 5%. We assume that those are to be the prices that were formerly set forth in the inventory previously taken.

"We would like to have the $3,000 paid forthwith and the amount of the purchase price upon inventory as per Item No. 3 to be paid upon delivery of the parts after completion of the inventory. We would like to have the inventory made with respect to Item No. 3 within the next ten days in order that we may know that this matter will be closed up as rapidly as possible.

"Mr. Hartman states that he will take the Mino Buck truck delivery and will do so before May 1st. In fact he expects to take delivery as soon as you have completed the inventory and taken delivery of the parts."

In pursuance of this agreement of settlement, the defendant on April 4, 1950, paid Hartman $3,000 and on the same date Hartman executed and delivered to the defendant a release reading as follows:

"I, William L. Hartman, d/b/a Hartman White Truck Company, for and in consideration of $3,000, receipt of which is hereby acknowledged, do by these presents for myself and my company, my assigns, heirs and personal representatives, release and forever discharge The White Motor Company of Cleveland, Ohio, its successors or assigns, its branch offices or subsidiaries, its personnel in their individual capacities and in their capacities as agents for said company, and Bernard T. Kadow, now d/b/a Kadow's White Truck Sales, his assigns, heirs and personal representatives, in his individual capacity and in his capacity as agent for the said White Motor Company or the said Kadow's White Truck Sales, and all personnel of the said Kadow's White Truck Sales in their individual capacities and capacities as agents

for the said White Motor Company or the said Kadow's White Truck Sales, of and from any and all manner of action or actions, cause and causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, executory agreements or understandings, contracts, controversies, agreements of any nature, promises, trespasses, damages, judgments, executions, claims and demands whatsoever of every nature, in law or equity, which against them I have had, claimed or alleged, now have, or which my assigns, heirs or personal representatives hereafter can, shall or may have, for or by reason of any matter, cause or thing whatsoever up to and inclusive of the day of these presents; excepting and reserving the following particular, and only the following particular:

"Whereas, I, William L. Hartman, d/b/a Hartman White Truck Company, was until January 31, 1950, a franchised distributor of the products of the said White Motor Company, with whom I mutually agreed to cancel and terminate said franchise on said date. The $3,000 herein recited as consideration for this release represents a settlement, among other controversies and misunderstandings which have arisen, of all accounts and claims of any nature which resulted from the mutual conduct of said distributorship;

"Except my agreement to sell and the agreement of the said White Motor Company to repurchase certain parts according to terms set out in recent correspondence between the said White Motor Company and my attorney, Mr. Clifford A. Mitts, Jr., and I hereby reserve my right to the claims of settlement of said parts repurchase according to the terms of said correspondence, such claim I reserve only against the White Motor Company of Cleveland, Ohio, in its corporate capacity and against no individual and no other business concern.

"It is understood that in addition to the $3,000 herein recited as consideration, that I shall receive an additional amount of $127.95 upon the payment for and accept-ance of the delivery of one truck which I have ordered for a Mino Buck; provided, however, payment is made for the truck and delivery thereof is taken by me prior to May 1, 1950. In the event this transaction is not consummated by me by that date, I relinquish any claims I may have against the White Motor Company for said truck or for said $127.95."

Following the above transaction between the parties on April 4th, the truck parts were reinventoried by defendant's representatives, and the parts were boxed or packaged and, at the instruction of defendant, were delivered to the place of business of Kadow's White Truck Sales, which had succeeded the plaintiff in handling the defendant's trucks and parts in this territory. There were negotiations between the parties or their attorneys regarding the items to be included in this inventory and regarding the pricing of the items. These negotiations finally resulted in an agreement that the purchase price of the parts would be $10,096.08.

It appears to have been agreed by the attorneys for the parties that the proposed transaction for the sale of the truck parts by plaintiff and their purchase by defendant would be closed on June 23, 1950. On that date defendant's attorney Servaas, plaintiff's attorney Mitts, and plaintiff Hartman met in Mitts' office. At this meeting defendant's attorney presented to the plaintiff a document which was, in effect, a bill of sale of the truck parts to defendant, a warranty of title, and a release of the defendant from all liability to plaintiff. Defendant's attorney insisted that plaintiff sign this document, but plaintiff, on the advice of his attorney, refused to sign. He based his refusal on the ground that he had already executed a general release to the defendant and Kadow on April 4, 1950, and that he was not obligated to execute a second release. Defendant's attorney refused to deliver its check for the purchase price of the parts unless plaintiff signed the document, and at this point the negotiations were terminated. Immediately after the conclusion of this meeting

in Mitts' office, defendant's attorney wrote plaintiff's attorney as follows:

"On behalf of the White Motor Company of Cleveland, Ohio, we are hereby serving notice that their last offer to Mr. W. L. Hartman d. b. a. Hartman White Truck Co., having been rejected by Mr. Hartman, is hereby revoked. All other offers to Mr. Hartman have been previously revoked, terminated by counteroffers, or lapsed under their terms by the passage of time. To avoid any misunderstanding, any and all, offers of any nature heretofore directed by the White Motor Company to Mr. W. L. Hartman are hereby revoked.

"We have advised, and Mr. B. T. Kadow has agreed, upon receipt for same by Mr. W. L. Hartman, to surrender all parts delivered to Kadow's White Truck Sales for contemplated repurchase by the White Motor Co. Arrangements for picking up these parts may be made by Mr. Hartman, with Mr. Kadow, at their mutual convenience."

It also appears that immediately after the conclusion of the above-mentioned meeting on June 23d, Hartman began suit against the White Company in the circuit court of Kent county, Michigan, but that such suit was later dismissed on the ground that the plaintiff had failed to obtain proper service of process. Subsequently plaintiff began the present suit in this court to recover the agreed purchase price of the truck parts. Defendant answered, denying liability and contending that plaintiff had failed to comply with the so-called bulk sales law of Michigan, Comp. Laws Mich. 1948, § 442.1 et seq., and that such compliance was a condition precedent to the defendant's obligation to purchase and pay for the truck parts. The defendant also contended that the plaintiff had breached the agreement of settlement by refusing to execute the document its attorney submitted to him at the meeting on June 23, 1950, and that such breach entitled defendant to rescind the agreement and refuse to purchase or pay for the parts.

On the other hand, plaintiff contended that the truck parts had been delivered to defendant and that their attorneys had agreed upon a method of procedure for the payment of plaintiff's creditors, which procedure the defendant had agreed to accept as a compliance with the bulk sales law. Plaintiff further contended that he was not obligated to execute the document presented by defendant's attorney at the meeting on June 23d, and that defendant had breached the agreement of settlement by demanding that he sign such document.

The testimony was conflicting upon the issue as to whether the parties had agreed upon a substitute plan for plaintiff's compliance with the bulk sales law and as to whether a substitute plan, if agreed upon, had been performed by plaintiff. The testimony was also conflicting as to whether the parties contemplated that plaintiff would execute a second or further release to defendant when the transaction for the sale and purchase of the truck parts was concluded. The case was submitted to the jury, which returned a verdict for the plaintiff in the amount of $10,096.08, and judgment was entered thereon.

On September 21, 1951, defendant filed a motion to set aside the verdict and judgment and for the entry of a judgment in its favor notwithstanding the verdict, in accordance with its motion for a directed verdict made at the close of all proofs. In the alternative, the defendant's motion asks that the verdict and judgment be set aside and a new trial granted. This motion for a judgment notwithstanding the verdict or, in the alternative, for a new trial, is made in pursuance of Rule 50(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A., which provides in part: "Whenever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. Within 10 days after the reception of a verdict, a party who has moved for a directed verdict may move to

have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict * * *. A motion for a new trial may be joined with this motion, or a new trial may be prayed for in the alternative. If a verdict was returned the court may allow the judgment to stand or may reopen the judgment and either order a new trial or direct the entry of judgment as if the requested verdict had been directed."

In Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 250–251, 61 S.Ct. 189, 194, 85 L.Ed. 147, the court said: "A motion for judgment notwithstanding the verdict did not, at common law, preclude a motion for a new trial. And the latter motion might be, and often was, presented after the former had been denied. The rule (50[b]) was not intended to alter the existing right to move for a new trial theretofore recognized and confirmed by statute. It permits the filing of a motion for judgment in the absence of a motion for a new trial or the filing of both motions jointly or a motion for a new trial in the alternative."

In 5 Moore's Federal Practice, 2d Ed., § 50.12, pp. 2340–2341, it is stated: "The decision of the Supreme Court in the Montgomery Ward case clarifies the practice to be followed under Rule 50(b) by the trial court where the party against whom verdict has been rendered makes a motion for judgment n. o. v., together with a motion, joint or alternate, for a new trial, and also the practice in appealing such a case and in disposing of the appeal. As to trial practice in disposing of the motion for judgment n. o. v., and the joint or alternate motion for a new trial, it is declared preliminarily that Rule 50(b) was not intended to alter the existing right to move for a new trial theretofore recognized by statute and confirmed by Rule 59(a), but permits the filing of a motion for judgment in the absence of a motion for a new trial or the filing of both motions jointly or a motion for a new trial in the alternative. Rule 50(b) recognizes that each motion has its own office and depends on different grounds, although those grounds may overlap; and that the *motion for judgment n. o. v. cannot be granted unless a verdict should have been directed for the movant,* while the motion for a new trial may invoke the discretion of the court insofar as it claims that the verdict is against the weight of evidence, that the damages are excessive or inadequate, or that, for other reasons, the trial was not fair to movant, and may raise questions of law as to substantial errors in admission or rejection of evidence, or instructions to the jury. The provisions of Rule 50(b) are construed not to confine the trial judge to an initial choice of either motion; that the granting of the motion for judgment n. o. v. does not operate as a denial of the motion for a new trial. Accordingly it is held, because consistent with the language of Rule 50(b) and for reasons of convenient and expeditious practice, that if alternative prayers or motions are presented for judgment n. o. v., and for a new trial, *the trial judge should rule on the motion for judgment, and whatever his ruling thereon may be, he should also rule on the motion for a new trial,* indicating the grounds of his decision."

In the present case the defendant's motion for judgment notwithstanding the verdict is to be regarded as the renewal of its motion for a directed verdict, and it must be considered in the light of those rules applicable to motions for directed verdicts. The defendant's alternative motion for a new trial must be considered in the light of those rules applicable to motions for new trials. See 2 Barron & Holtzoff, Federal Practice and Procedure, Rules Ed., § 1080, pages 776–777; 3–A Ohlinger's Fed.Prac., Rev.Ed., page 163. The law is well stated by Judge Parker in Garrison v. United States, 4 Cir., 62 F.2d 41, at page 42 as follows: "There seems to be some confusion * * * as to the difference between the duty to direct a verdict and the duty to grant a new trial after verdict * * *. The distinction, however, is clear. * * * Verdict can be di-

334

rected only where there is no substantial evidence to support recovery by the party against whom it is directed or where the evidence is all against him or so overwhelmingly so as to leave no room to doubt what the fact is. Gunning v. Cooley, 281 U.S. 90, 50 S.Ct. 231, 74 L.Ed. 720. Verdict may be set aside and new trial granted, when the verdict is contrary to the clear weight of the evidence, or whenever in the exercise of a sound discretion the trial judge thinks this action necessary to prevent a miscarriage of justice."

The defendant's motion, insofar as it asks for a judgment notwithstanding the verdict, is based upon the same contentions that were advanced in support of its motion for a directed verdict. Defendant contends in substance that as a matter of law plaintiff was bound to comply strictly with the provisions of the Michigan bulk sales law as a condition precedent to its duty to purchase and pay for the truck parts here in question; that plaintiff failed to comply with the bulk sales law; and that it was legally entitled to rescind the contract and refuse to pay for the parts. Defendant further contends that under the evidence presented and the court's instructions, the jury should have returned a verdict in its favor.

As the jury, under the instructions given, returned a verdict for the plaintiff, it may be assumed that it found the following facts:

(1) That the defendant had waived strict compliance with the provisions of the Michigan bulk sales law and had consented to a substitute plan for the payment of plaintiff's creditors;

(2) That, if defendant had agreed to a substitute plan, the plaintiff was ready, willing, and able to carry out the provisions of that plan as satisfaction of the condition precedent to defendant's obligation to purchase and pay for the truck parts;

(3) That the parties did not intend or contemplate that upon the closing of the transaction for the sale and purchase of the truck parts the plaintiff would execute a further release of all claims which he might have or claim to have against the defendant.

Defendant contends that even if the jury found that defendant had waived its right to strict compliance with the Michigan bulk sales law and had consented to a substitute plan for the payment of plaintiff's creditors, and that it was not entitled to the second release demanded by its attorney on June 23, 1950, still the plaintiff was not entitled to recover, because the evidence did not establish that he was ready, willing, and able to carry out the provisions of the substitute plan. The court cannot agree with this contention. Whether or not the parties agreed to a substitute plan, what its terms were, and whether or not plaintiff complied with them, were, under the court's instructions, all questions of fact for the jury. The jury was the sole judge of the facts and the credibility of witnesses and the weight to be given their testimony. There was testimony which, if believed by the jury, would justify its finding that defendant had agreed to a substitute plan for the payment of plaintiff's creditors, and which would justify its finding that plaintiff was ready, willing, and able to perform the substitute plan. There was also testimony which, if believed by the jury, would justify its finding that the parties did not intend or contemplate that at the time the transaction was closed, plaintiff would execute a further release of all claims against defendant.

It is unnecessary to discuss the evidence in detail or to analyze exhaustively the court's instructions. The instructions, when considered as a whole, presented certain questions of fact for jury determination, and there was evidence which, if believed by the jury, could have sustained a finding for either party on these questions of fact. The testimony presented was in many particulars conflicting, and in the case of conflicting testimony the court should not direct a verdict. In 5 Moore's Federal Practice, 2d Ed., § 50.02, at page 2315, it is stated: "Where the evidence is conflicting or there is insufficient evidence

to make only a 'one way' verdict reasonably possible, a directed verdict is improper."

See also Gunning v. Cooley, 281 U.S. 90, 50 S.Ct. 231, 74 L.Ed. 720; Garrison v. United States, 4 Cir., 62 F.2d 41; 2 Barron & Holtzoff, Federal Practice and Procedure, § 1075, pages 759–770, and authorities cited.

 The court being convinced that the denial of defendant's motion for a directed verdict at the conclusion of all proofs was proper, it follows that defendant's present motion for judgment notwithstanding the verdict must be denied.

The defendant's motion in the alternative for a new trial is based primarily upon the contention that the jury's verdict for the plaintiff in the sum of $10,096.08 was a compromise verdict and contrary to the court's express instructions and the law of the case. Defendant also contends that the verdict must be set aside because the court's instructions were conflicting and inconsistent. The question of the propriety of the verdict and of the court's instructions arose from the following facts: The court instructed the jury as to the possible verdicts it might return as follows: "If you find that the plaintiff is entitled to recover, the court instructs you that he is entitled to recover the sum of $10,096.08 together with interest on that sum at the rate of 5% from June 23, 1950, to this date, which interest amounts to the sum of $617.92. Therefore, if you find that the plaintiff is entitled to recover, your verdict should be as follows: 'We find for the plaintiff and against the defendant, and assess plaintiff's damages at the sum of $10,714.' If you find that the plaintiff is not entitled to recover, then you should return a verdict for the defendant of 'No cause of action.' "

Counsel for neither party objected or took exception to this instruction. The jury, after lengthy deliberation, submitted a question to the court and, in open court with counsel for both parties present, the judge said:

"The jury by its foreman has submitted to the court the following written question, which I quote:

" 'The jury is in a position to render a unanimous verdict for the plaintiff against the defendant, in the sum of $10,096.08, and not including the interest amount of $617.92. Will this verdict be acceptable to the court?'

"The court's answer is:

"The matter of what verdict a jury shall return is solely within the province of the jury. The court cannot rule or decide that any particular type of verdict will or will not be acceptable."

The defendant contends (1) that the court's answer to the jury's question constituted an additional instruction, conflicting and inconsistent with the original instruction in that it permitted the jury to return a verdict other than the two possible verdicts expressly set forth in the original charge, and (2) that if the court's answer to the question was not conflicting or inconsistent with the court's original instruction, the jury's verdict was contrary to the original instruction.

 At the conclusion of the proofs the court had fully instructed the jury as to the law of the case and as to what possible verdicts it might return. The court's statement in answer to the question submitted by the jury during its deliberations was not an additional instruction. The court did not instruct the jury that the verdict it proposed would be acceptable or that it would not be acceptable. The court's statement in no way added to, nor did it in any way conflict with, the original instruction. It was no more than a carefully worded refusal to answer a question which, under our system of jurisprudence, must in every jury case be answered by the jury. It did no more than inform the jury that the court would not usurp its historic function.

The court had instructed the jury in perfectly plain language as to the measure of damages it should find plaintiff had

sustained, if it found that he was entitled to recover. The court's instruction was unequivocal that if the jury found that plaintiff was entitled to recover, it should assess his damages at the sum of $10,714. In the face of this express instruction the jury assessed plaintiff's damages at $10,096.08.

The ultimate question to be decided is whether this verdict may stand or whether it must be set aside and a new trial granted. However, there is a preliminary question that must be disposed of first, viz.—is the validity of a jury's verdict in a Federal district court to be determined under the law of the State in which the court is located or under the established Federal law? In other words, should the validity of the jury's verdict in this case be tested under the law of the State of Michigan or under Federal law?

The plaintiff contends that while the process used in Federal courts to *correct* an improper verdict is procedural and, therefore, governed by Federal rules, the question as to whether or not a verdict *is* improper is a matter of substantive law, to be determined by State law. That is, the plaintiff argues that in determining the question of the validity of the jury's verdict in the present case this court must look to the law of Michigan. On the other hand, the defendant contends that the question as to the validity of the jury's verdict and as to its right to a new trial must be determined in accordance with the established Federal law.

Rule 59(a) of the Federal Rules of Civil Procedure provides in part: "A new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, *for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States"*.

In 3 Barron and Holtzoff, Federal Practice and Procedure, page 223, it is stated: "The grant or denial of a new trial is a matter of procedure governed by these rules and not by state law or practice."

In Bernstein v. Olian, D.C., 77 F.Supp. 672, plaintiff had been injured by a fixture's falling from the ceiling of a building owned by the Ems Corporation and leased by two individuals, Olian and Cantor. The jury found against Ems but exonerated Olian and Cantor. The Ems Corporation moved for a new trial on the ground that the jury's verdict was inconsistent, and it claimed that under the law of New York such a verdict must be set aside. The court by Judge Rifkind said, 77 F.Supp. at page 674:

"It is asserted, however, that the verdict must be set aside and a new trial ordered because the jury's inculpation of the landlord is inconsistent with its exoneration of the tenant. In the following discussion I shall assume that there is such inconsistency. The question is whether that compels the setting aside of the verdict.

"Defendant has cited much New York law holding that such inconsistency is fatal. * * *

"However, the question as to whether the verdict should be set aside and a new trial granted is one to be determined by federal rather than by state law. Rule 59, Federal Rules of Civil Procedure".

See also Aetna Casualty & Surety Co. v. Yeatts, 4 Cir., 122 F.2d 350, 352; Rice v. Union Pacific R. Co., D.C., 82 F.Supp. 1002, 1008; Kaufman v. Atlantic Greyhound Corporation, D.C., 41 F.Supp. 252, 254.

Under Rule 59(a) and the authorities cited it is clear that the question as to the validity of the jury's verdict in the present case should be determined by Federal rather than State law.

Federal courts have held that a jury's verdict contrary to the court's instruction on the question of damages should be set aside and a new trial granted. Garfield Aniline Works, Inc. v. Zendle, 3 Cir., 43 F.2d 537, 538; Stetson v. Stindt, 3 Cir., 279 F. 209, 210, 23 A.L.R. 302. In the Stetson case the court said:

"At the trial, there was no dispute about the amount due * * *. The court in-

structed the jury, as the law of the case, that their verdict should be for the whole of the plaintiffs' claim or for nothing. The jury, in actual disregard of the instruction, and without any evidence in the case to support their action, split the claim and rendered a verdict for about one-half. Therefore, the question before us is—Did the trial court err in entering judgment on this verdict?

"The law on the subject is not entirely settled. There are three lines of conduct which courts in this situation follow according as they regard their duty. One is, in an effort to sustain verdicts, courts will be slow to yield to the inference of compromise by juries and will indulge all presumptions in favor of the validity of verdicts. * * * Another meets the question frontally and is to the effect that, when instructed that the verdict shall be for all or nothing and the jury renders a verdict for something less than all, the verdict will be sustained on the theory that the losing party, not being injured, cannot be heard to complain that the verdict is too small. * * * The third is based on the broad propositions of law that a verdict which is contrary to the law of the case or which is not sustained by evidence in the case must be set aside. On this general law some courts have squarely met the question and have held that an instruction on the measure of damages is an instruction on the law, that a verdict by the jury in disregard of such instruction calls for a new trial, and that, under these circumstances, refusal by the trial court to grant a new trial constitutes reversible error. * * *

"We are persuaded by the ratio decidendi of the last line of authorities that a verdict like the one under consideration, which is perverse and directly violative of the charge of the court and is wholly without evidence to support it, cannot stand. It is not sufficient to say that the defendant cannot complain because he was not injured. He was injured by being deprived of the right of a litigant to have the jury determine his liability under the law as laid down by the court. That liability might be for more than the jury found; yet it might be for nothing. What his liability is, the jury refused to say; but said something else, which, under the law and on the facts, was simply untrue. Therefore, we are of opinion that the verdict was invalid and that the court erred in entering judgment upon it."

In Colonell v. Goodman, D. C., 78 F. Supp. 845, at page 849, affirmed 3 Cir., 169 F.2d 275, the court said: "I do not think that the Court's instructions to the jury were erroneous but, right or wrong, the refusal of the jury to find in accordance with them necessitates the award of new trial. 'Nonconformity of the verdict to the judge's charge is ground for a new trial, according to the weight of authority, regardless of the showing as to whether the instructions were right or wrong. Even if erroneous, they constitute the law governing the case, and it is the duty of the jury to follow them. Any other rule, it is said, would lead to endless confusion, sanctioning disregard of the court's opinion of the law applicable to the pleadings and the evidence, and rendering its instructions impotent except where willed otherwise by the jury.' Am.Jur., New Trial, Sec. 127."

In 3-A Ohlinger's Fed.Prac., Rev.Ed., page 421, it is stated: "The verdict may be set aside and a new trial granted where the verdict is contrary to the court's charge to the jury."

In 39 Am.Jur. § 128, page 137, it is stated: "Where the court has instructed the jury as to the quantum or measure of a party's liability—in the event that he is found to be liable for anything at all—and the jury has disregarded the instruction and brought in a verdict for a different amount, the court should set aside the verdict and grant a new trial."

The above authorities establish the Federal law which the court should apply to the question presented by defendant's motion for a new trial in the present case. The jury was expressly instructed that if it found for the plaintiff it should award him damages in the sum of $10,714. It found for the plaintiff but awarded a substantially

lesser sum. The verdict was violative of the court's express instruction, which was the law of the case. The court concludes that the jury's disregard of the court's instruction constitutes ground for granting a new trial.

An order will be entered (1) denying defendant's motion for judgment notwithstanding verdict and (2) granting defendant's motion for a new trial. No costs will be allowed on these motions.