## Brandywine Motor Cars Inc. v. Scott

*Randall C. Schauer,* for plaintiff.
*Robert T. Vance Jr.,* for defendant Scott.
*James Dunworth,* for defendant Burigatto.

WOOD, *J.,* January 15, 1987—

## ADJUDICATION

In this equitable interpleader action, Brandywine Motor Cars Inc. asks this court to determine the rightful ownership of $7,500, held in escrow, to which both defendants claim entitlement. Defendant Scott has counterclaimed for damages allegedly suffered as a result of plaintiff's refusal to turn the money over to him. Plaintiff, in turn, seeks attorney's fees and costs incurred in bringing this action. After hearing, held November 17, 1986, I make the following

## FINDINGS OF FACT

1. Plaintiff is Brandywine Motor Cars Inc., a corporation organized under the laws of Pennsylvania, with its principal place of business at 237 East Gay Street, West Chester, Pa.

2. Defendant Arthur L. Scott, Sr., is an individual residing at 209 Lincoln Avenue, Conshohocken, Pa.

3. Defendant Arturo Burigatto is an individual residing at 192 Welsh Pool Road, Lionville, Pa.

4. On February 17, 1985, the Friends Association for the Care and Protection of Children (the association) hosted a fundraiser for the benefit of

the association. It was held at plaintiff's place of business in West Chester.

5. In addition to providing space at its facility for the fundraiser, plaintiff donated a 1985 Mercedes-Benz 190D sedan to be awarded to the winner of a drawing to be held that evening.

6. Tickets for the drawing were distributed in return for a donation of $150 to the association. Three hundred tickets for the drawing were sold.

7. During the course of the fundraiser, defendant Scott purchased a ticket for the drawing.

8. Shortly before the drawing, defendant Burigatto suggested to defendant Scott that in the event one of them held the winning ticket, they would share the prize. In response to this suggestion, Scott replied "sure, fine."

9. The drawing was held and defendant Scott held the winning ticket.

10. Scott proceeded to the area of the drawing, where he addressed the crowd, stating: "We have two winners."

11. Defendant Burigatto arrived at the drawing area shortly after Scott's arrival.

12. Both Scott and Burigatto accepted congratulations from the crowd, and both sat in the car and posed for pictures.

13. Neither defendant took the Mercedes home that night.

14. The next day, February 18, 1985, both Scott and Burigatto arrived at plaintiff's place of business and began to argue about the disposition of the car.

15. James Mattola, the co-owner and sales manager of Brandywine Motor Cars. Inc., ushered the two defendants into his office and indicated that he wanted them to settle their dispute before he would release the car to either of them.

16. Mattola then left his office, and when he returned, Scott and Burigatto informed him that they had come to an agreement that Scott would pay $7,500 to Burigatto and would take title to and possession of the car.

17. Scott then completed a Motor Vehicle Installment Sale contract and a loan application for a loan from Hamilton Bank in order to finance the agreement with Burigatto. The proceeds of the loan were to be delivered to plaintiff for payment to Burigatto.

18. After Scott completed the loan documents, possession of and title to the Mercedes-Benz were delivered to him.

19. On or about February 19, 1985, Scott telephoned Kurt Wolter, president of Brandywine Motor Cars Inc., and instructed him to cancel the loan from Hamilton Bank and to return the money to Scott.

20. Mr. Wolter informed Scott that plaintiff would not return the money to him, and that the $7,500 proceeds of the loan would be placed in an escrow account pending a judicial determination of entitlement to it.

21. Scott has paid Hamilton Bank $202.69 per month since February 1985.

22. On March 15, 1985, Brandywine Motor Cars Inc. commenced this equitable interpleader.

## DISCUSSION

The parties to this action, in their arguments, treated the issue as a matter of contract law, and in oral argument, pooh-poohed my suggestion that the fundamental question is whether the lottery was legal in the first place. As a judge, however, I don't have the luxury of ignoring uncomfortable legal propositions. If the lottery was unauthorized by law,

any contract between the parties to share the prize awarded by the lottery was also illegal, and void ab initio.*

The basic elements of a lottery are (1) a prize to be won; (2) a winner to be determined by chance; and (3) the payment of a consideration by the player: Com. v. Lane, 242 Pa. Super. 283, 363 A.2d 1271 (1976); Com. v. Laniewski, 173 Pa. Super. 245, 98 A.2d 214 (1953); Appeal of Clock Bar Inc., 39 D. & C. 2d 625 (1966). All three elements are present in this case. 18 P.S. §5512(a) states:

"All unlawful lotteries or numbers games are hereby declared to be common nuisances. Every transfer of property which shall be in pursuance of any unlawful lottery or numbers game is hereby declared to be invalid and void."

18 P.S. §5512(d) states:

"As used in this section the term 'unlawful' means not specifically authorized by law."

The legislature has authorized certain exceptions to the gambling laws. The Race Horse Industry Reform Act of December 17, 1981, P.L. 435, No. 135, 4 P.S. §325.101 et seq., authorizes certain licensed corporations to conduct "pari-mutuel wagering" at thoroughbred or harness horse race meetings with the Commonwealth to receive a percentage of the

---

* Even though illegality of contract was not pleaded or raised by any party to this action, it was not waived since it goes to the very substance of the action: Shafer v. A.I.T.S. Inc., 285 Pa. Super. 490, 428 A.2d 152 (1981); Norristown Ford Co. v. Metropolitan Auto Dealers Inc., 183 Pa. Super. 645, 132 A.2d 725 (1957); 2 Goodrich Amram 2d §1030: 1.3 p. 290. In this regard, a court will of its own motion take notice of the illegality of a contract, although it is not pleaded by the parties. See, Colonell v. Goodman, 78 F. Supp. 845, affirmed 169 F.2d 275, cert. den. 335 U.S. 870, 69 S. Ct. 166, 93 L.Ed. 414 (1948); Goldman v. Kaplan, 51 D. & C. 684 (1944).

gross revenues. The State Lottery Law of August 26, 1971, P.L. 351, §1, 72 P.S. §3761-1 et seq., allows the government to conduct gambling, with the net revenues to be used for charity. The Bingo Law of July 10, 1981, P.L. 214, No. 67, 10 P.S. §301 et seq., permits certain licensed nonprofit organizations to conduct bingo games for the promotion of charitable or civic purposes.

The fundraiser conducted by the Friends Association does not fall under any of these exceptions as an authorized form of gambling; hence, this fundraiser constituted an "unlawful" lottery under Pennsylvania law. There is no evidence to suggest that the proceeds of this fundraiser were used for anything but charitable purposes. However, the proscriptions of 18 Pa.C.S. §§5512 and 5513 apply even to lotteries conducted by a charitable organization in order to provide funds for the charity's continued efficient operation: Com. v. Wida, 12 D. & C. 3d 1 (1979). I am sure that virtually every reader of this opinion has, at some time in his or her life, participated in some manner in a charitable drawing. Nonetheless, the law is the law.

Having found that the lottery in this case was unauthorized by law, any agreement defendants may have made to share in the prize will not be enforced by this court, since an agreement that cannot be performed without violation of statute is illegal and void ab initio: Shafer v. A.I.T.S. Inc., 285 Pa. Super. 490, 428 A.2d 152 (1981).

Likewise, the compromise agreement entered into by the parties on February 18, 1985, is unenforceable as well. Although the law recognizes that a compromise of a *void* contract, made in good faith, will be enforced, neither a novation nor a compromise of an *illegal* claim should be enforced: 15A C.J.S. Compromise and Settlement §1, p. 172.

"The compromise of an illegal claim out of which no cause of action can arise in favor of the person asserting it is not sufficient consideration to support a compromise agreement. Thus, the settlement of a claim based on a contract which is against public morals or policy, or which is inherently illegal, or which is in direct violation of the statutes, cannot form the basis of consideration for a valid compromise settlement." 15A C.J.S. Compromise and Settlement § 10.

Thus, there was no enforceable contract made between the parties on February 18, 1985, and the proceeds of Scott's loan from Hamilton Bank should be returned to Scott.

It may be plausibly argued that, since the contract is unenforceable, a court should simply wash its hands of the whole thing and make no award. That is a tempting position. However, it does not solve plaintiff's problem, and since plaintiff was not strictly a participant in the lottery, but simply a contributor to the charity, and is now before the court solely as a stakeholder, I think I must give plaintiff guidance on what to do with the money it holds. Where the equities are equal (or, as in this case, nonexistent), the law will prevail: Taggart v. Keim, 103 F.2d 194 (3d Cir. 1939). Since the loan was made to Scott, it *is* his money at the moment.

Scott has counterclaimed against plaintiff, accusing it of conspiring with Burigatto against Scott and making misrepresentations to Scott, in order to coerce him into agreeing to pay Burigatto $7,500 and to take out a loan for that amount. Scott has failed to show that plaintiff used any form of coercion to induce Scott to make a loan application, and he has failed to prove misrepresentation or conspiracy. I find that Brandywine Motor Cars Inc. acted reasonably under the circumstances in declining to return

the proceeds of the loan to Scott and in instituting this action in interpleader. Therefore Scott is not entitled to recover from plaintiff.

Plaintiff Brandywine Motor Cars Inc. may be entitled to reasonable attorney's fees and costs for conducting this litigation, under 42 Pa.C.S. §2503(4). I therefore invite plaintiff to file an appropriate petition pursuant to C.C.R.C.P. 241(c). Under the circumstances of this case, justice and equity dictate that any such payments come from the fund now held by plaintiff. It was, after all, Scott who authorized the creation of the fund and then prohibited its release to Burigatto.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of this matter.

2. The fundraiser hosted on February 17, 1985, by the Friends Association for the Care and Protection of Children constituted a lottery unauthorized by Pennsylvania law.

3. Any agreement defendant may have entered into to share the prize drawn in the lottery violates the statutes of Pennsylvania and was therefore unlawful and void ab initio.

4. The compromise which defendants purported to make on February 18, 1985, is void for want of consideration.

5. Arturo Burigatto has no claim to the fund held in escrow by plaintiff's attorneys.

6. Scott is not entitled to recover on his claims against Brandywine.

## DECREE NISI

And now, this January 15, 1987, the proceeds of the loan from Hamilton Bank which are held in escrow pending resolution of this case, less any rea-

sonable costs and attorney's fees incurred by Brandywine Motor Cars Inc., shall be delivered to Arthur L. Scott. Upon delivering this money to Scott, plaintiff shall be discharged from all liability to either of defendants with regard to this fund. If plaintiff and defendant Scott cannot agree on what are reasonable fees and costs, either one may file the appropriate petition with this court.