Stella McSPARRAN, Administratrix of the Estate of Ignatius Peter Kane, Deceased

v.

John HANIGAN, Individually and trading as Hanigan Construction Company,

and

Walter Hinkle, Individually and trading as the Hinkle Excavation Company,

and

Robert R. Tyler, Individually and trading as Robert F. Tyler and Co.,

and

JOHN McSHAIN, INC., Defendant and Third-Party Plaintiff,

v.

WILLIAM H. WALTERS & SONS, INC., Third-Party Defendant.

Stella McSPARRAN, Administratrix of the Estate of Ignatius Peter Kane, Deceased,

v.

Edward Thomas SUBERS.

Civ. A. Nos. 25983, 27768.

United States District Court
E. D. Pennsylvania.

Dec. 27, 1963.

B. Nathaniel Richter, Arthur G. Raynes, Philadelphia, Pa., for plaintiff.

John J. McDevitt, 3rd, Philadelphia, Pa., for John Hanigan, individually and trading as Hanigan Const. Co.

Charles L. Ford, Philadelphia, Pa., for Walter Hinkle, individually and trading as Hinkle Excavation Co.

Michael A. Foley, Philadelphia, Pa., for Robert R. Tyler, individually and trading as Robert F. Tyler & Co.

Henry F. Huhn, Philadelphia, Pa., for John McShain, Inc.

Ronald Ziegler, Philadelphia, Pa., for Edward Thomas Subers.

FREEDMAN, District Judge.

Numerous post-trial motions have been filed by all the defendants and by the plaintiff after a lengthy jury trial which resulted in verdicts against all the defendants.

On June 11, 1958, plaintiff's decedent, a plumber, was killed by the cave-in of a trench which was being excavated on the grounds of Misericordia Hospital in Philadelphia as part of the work of erecting an additional wing. He was employed by William H. Walters & Sons, Inc., the plumbing subcontractor of John McShain, Inc., the general contractor. Walters' foreman on the job was Subers.

Walters had contracted with Walter Hinkle, trading as Hinkle Excavation Company, to dig the trench, in which a sewer line was to be laid. Hinkle arranged for John Hanigan, trading as Hanigan Construction Company, to do

the job. Robert R. Tyler, trading as Robert F. Tyler and Co., was a dynamiter working on the site.

Two actions were brought by decedent's administratrix. One was against Subers under the survival act; a wrongful death claim against Subers had been barred by the statute of limitations. The other action was against Hanigan, Hinkle, Tyler and McShain, for both wrongful death and survival claims. Both actions were consolidated for trial. A variety of third-party and cross-actions also were involved, but they are not involved in the problems presented by the present motions.

Many questions have been raised in the briefs and arguments. I have considered all of them, but shall deal here only with those that are significant enough to require discussion.

## I

### THE LIABILITY OF THE DEFENDANTS

[1] The first question raised by the post-trial motions is the liability of the several defendants as a matter of law. Of course, in such cases whatever evidence supports the verdict must be taken to be true and whatever evidence runs the other way must be disregarded.

#### 1. *Hanigan.*

Hanigan admittedly dug the trench with his own equipment, over which he had complete control. He dug the trench at the precise place marked out for him by Subers, Walters' foreman. Hanigan was not in the business of shoring.[1] The essence of his defense is that he was hired merely to dig, he dug as he was told, and his limited work was done properly and without negligence. Hence he contends that the jury's finding that he was negligent is unsupportable as a matter of law.

The contention that Hanigan was not subject to the duty of shoring imposed by the statute and regulations[2] because plaintiff's decedent was not his employee may be set aside at the outset on the authority of Quinones v. Township of Upper Moreland, 293 F.2d 237 (3d Cir. 1961).[3] In that case, the township was held bound by the shoring requirements because of the control it retained over the excavation, although it was not the employer of the injured workman. A fortiori, Hanigan, the excavator himself, had sufficient control over the excavation[4] to be held bound by the regulations.

Nevertheless, the jury was specifically instructed that neither the statute nor the regulations require that one who digs trenches must also be in the business of shoring. No liability may be imposed on him if he reasonably expects that the excavation will be shored by another after his work is completed.[5] On the other hand, the jury was told that one who is simply engaged in digging ditches may not dig a ditch which he knows or should know the law requires must be shored, if he knows that

1. The term "shoring" is here used generally to include bracing and "V-ing" and any other process by which the trench might have been strengthened or supported.

2. Act of May 18, 1937, P.L. 654, § 2(f), 43 P.S. § 25–2(f); Regulations for Trenches and Excavations (1956 ed.), issued by the Pennsylvania Department of Labor and Industry pursuant to Act of May 18, 1937, P.L. 654, § 12, 43 P.S. § 25–12.

3. Accord, Drake v. Fenton, 237 Pa. 8, 85 A. 14 (1912).

4. Although the regulations distinguish between "trench", "ditch", and "excavation", I shall use the words interchangeably.

5. Jones v. McNichol Paving & Construction Co., 317 Pa. 246, 176 A. 444 (1935); Walker v. McNichol Paving & Construction Co., 325 Pa. 267, 189 A. 673 (1937). Hanigan's reliance on these cases is misplaced, for in them, the general contractor did undertake to shore, but did so inadequately. Therefore, the excavator did not know or have reason to know that the ditch would be left unshored. See the discussion by Stern, P. J., of the court below in the Jones case, 317 Pa. at 250–252, 176 A. at 445–447, distinguishing Bisson v. John B. Kelly, Inc., 314 Pa. 99, 170 A. 139 (1934).

it will be left unshored. In that event he would be negligent because of his knowing participation in the violation of the statute.[6] Indeed, the contention that Hanigan should be excused because he only did what Subers required him to do is doubly weak. For here his conduct offended not only against common law standards of due care for the safety of others, but also against a statute which prescribes criminal punishment for violation of the regulations promulgated under it.[7]

The jury was also permitted to find negligence, aside from the violation of the statute and regulations, if it determined that Hanigan knew that it was dangerous to dig the trench at the location to which it was moved, in view of the nature of the soil, the weight of his equipment, and all of the other circumstances surrounding his work.

The evidence supports a finding of negligence on either or both aspects of the charge. Hanigan knew of the shoring requirement. He knew as he dug the trench section by section that it was not being shored and that none of those to whom he was to deliver his completed work would shore it. He knew also that the trench had to be dug along the very edge of a shanty which McShain's foreman, Parker, had refused to move; and that the ditch, therefore, had to be dug so narrowly that it could not be "V-ed" or braced and still be wide enough for the plumbers to work in it. Hanigan admitted that in digging the trench he destroyed the shanty's lateral support and that the ditch caved in at a point adjacent to the shanty. His equipment was heavy, weighing about $4\frac{1}{2}$ tons; yet in the course of the work he had it straddle the trench and rest on each bank, thus adding to the burden on the unshored trench. As the one who did the digging he must have been familiar with the loose and sandy nature of the soil, and he surely was aware that blasting operations were being conducted in the vicinity.

■ It matters not that Subers marked out where Hanigan should dig. Hanigan was experienced in this line of work and he could not transfer his negligence to Subers. If Subers acted without due care in what he did this means only that Subers is jointly and severally liable with Hanigan and not that Hanigan is excused because of Subers' concurrent negligence.

2. *Hinkle.*

■ Plaintiff offered no proof that Hinkle did any work on the job. None of his equipment was brought on the premises. An effort was made to prove that he had participated in a discussion on the job with Parker and Subers on whether the trench should be shored. The evidence on this, however, was so uncertain that it was not pressed.[8] Liability therefore must rest on Hinkle's responsibility for the negligence of Hanigan. This was left for the jury to determine, and in the circumstances it was broken down into whether (a) there was a novation by which Hanigan took Hinkle's place in the contract with Walters; (b) Hinkle employed Hanigan as his employee; and if not, (c) whether they were joint venturers. The jury was instructed that if they found from the circumstances that there was a novation then Hinkle would not be liable even though Hanigan was negligent. If, on the other hand, they found that Hinkle was Hanigan's master, or a joint ven-

---

6. Transcript, 1469–1470. Fulfillment of his contractual duty to dig the ditch would not necessarily discharge his "social-legal duty". See Bisson v. John B. Kelly, Inc., 314 Pa. 99, 107, 170 A. 139 (1934).

7. Act of May 18, 1937, P.L. 654, § 12, 43 P.S. § 25–12.

8. "There is a fragment, or there has been a fleeting reference to Hinkle having done something at one point in the way of a dis-cussion with Parker and Subers about whether there should be shoring. But I think that the evidence on that was so vague that you might very well consider that it has not been pressed, and it has not been referred to in the arguments to you, as to whether Hinkle was even present at that time. But I think Subers mentioned that and then went on to say that he was not sure that Hinkle had been there." Charge, Transcript, 1473.

turer with him, then any negligence of Hanigan would also be chargeable to Hinkle.

(a) *Novation.*

Novation was left to the jury in non-technical language.[9] There was adequate evidence to support a finding against novation. The only contract document was Walters' purchase order to Hinkle. Hinkle regularly billed Walters for the work done. The contract payments under the purchase order, amounting to $1,494., were made by Walters to Hinkle, and not to Hanigan. Hinkle claimed that he paid over all but $59. of this amount to Hanigan. This retention of money by Hinkle, however small the amount, was an element in the determination of the intention of the parties. The fact that Walters periodically made payments to Hinkle after Hanigan is claimed to have taken his place is a fundamental contradiction of the claim of novation.

(b) *Master and servant.*

The jury was left to determine whether a master and servant relationship existed. The test given to them was whether Hinkle controlled or had a right of control over the manner and means by which Hanigan performed his work.

There was evidence from which the jury could have found a master-servant relationship. Hanigan testified that Hinkle sent him to the job, told him what equipment to bring and from whom he should take orders. (Transcript, 771–73). Hanigan reported regularly to Hinkle the time he spent on the job so that Hinkle could bill Walters for the work done. Hinkle also indicated that he acted in such a fashion as to retain the right to go back on the job whenever he wished. (Transcript, 754). Finally, the fact of the payments to Hinkle, who then paid Hanigan, is consistent with a master-servant relationship between the two.

(c) *Joint Venture.*

The jury was told the legal essentials of a joint venture: that each party must make a contribution to it, either in the way of money or skill or services or property; that profits be shared among them; that they have a joint proprietary interest and right of mutual control over the subject matter of the enterprise; and that usually a joint venture arises in a single business transaction rather than a general continuous one, which is more commonly that of a partnership, but that it may be created otherwise and may be for more than a single enterprise. The jury was instructed that the existence of these elements depended entirely on the intention of the parties manifested by a contract either expressed in specific terms or implied from their conduct. See McRoberts v. Phelps, 391 Pa. 591, 599–600, 138 A.2d 439 (1958).

There was evidence, however sparse, from which the jury could have resolved this question of intention against Hinkle. The enterprise was the work of individuals and their machines, and was furthered by their pooling of their resources in equipment and labor. When, as in this instance, Hinkle had work but his equipment was not available he arranged for Hanigan to do the job without any new contract or purchase order from Walters. Hanigan and Hinkle were in

---

9. "Hinkle's position, stated in the briefest terms, is that it turned out that he couldn't, for one reason or another, do the job, although originally it had been thought that he would. And so he got Hanigan to take the job over in his place.

"I won't trouble you with technical, legal terms that might deal with this kind of a problem.

"But essentially the position of Hinkle is that he dropped out of the deal, and no longer was a contracting party with Walters, and, instead, he was substituted by Hanigan, and Hanigan took his place.

"If you find, members of the jury, from all of the evidence that the intention of the parties was that Hanigan took over Hinkle's responsibility, which had never yet come into operation, and that Hinkle dropped out of the transaction and Hanigan took his place, then, members of the jury, you would have to find * * * that Hinkle is not responsible." Charge, Transcript, 1474–75.

regular communication with each other regarding the work that Hanigan was doing and the bills to be sent to Walters. Hinkle received payments from Walters for Hanigan's work and made weekly payments from these funds to Hanigan. Some part of the payments, however small, was retained by Hinkle. Viewing the evidence in the light most favorable to the plaintiff, there was enough to support a conclusion by the jury that they were co-venturers.

### 3. Subers

■ Although Subers attacks the verdict on a number of grounds he makes no claim of a lack of evidence to support a finding of liability. Indeed if any of the defendants is liable, the evidence points most directly to Subers. He was Walters' foreman who directed where the trench was to be dug; when he discovered that the planned line would have gone through the middle of the shanty he moved the line of the trench to the edge of the shanty; he determined that the trench would not be shored although he knew this was required by the regulations. With all this knowledge it was he who ordered the decedent into the unsafe trench. His liability for negligence is clear beyond doubt.

■ Counsel for Subers calls attention to the recent Pennsylvania Act of August 24, 1963 (Act No. 496), adopted some months after the trial. The Act amends the Pennsylvania Workmen's Compensation Act by adding a new section which exempts a fellow employee from liability except for intentional wrong.[10]

If this section applies, it would operate to relieve Subers, a fellow employee of the decedent, from liability for his death, since there is no claim of intentional wrong by Subers. The Act, however, is inapplicable because the negligence of Subers occurred long before the statute was adopted. Indeed, the verdict of the jury was rendered on April 16, 1963, more than four months before the adoption of the Act. Aside from any difficulty with a retrospective operation of such a statute, it is made inapplicable by its very terms to a case such as this. For it provides in § 2: "This act shall take effect immediately, but shall not apply in the case of disability or death for which a right to compensation under this act accrued on or before the effective date of this act." Since the decedent's right to compensation under the Workmen's Compensation Law "accrued", in the language of § 2, "on or before the effective date" of the Act, Subers' common-law liability obviously is not altered by it.

### 4. McShain.

■ The verdict against McShain presents the problem of the so-called "statutory employer" provided for in § 203 of the Pennsylvania Workmen's Compensation Act, as amended (77 P.S. § 52).[11] The section was conceived for the protection of an injured employee of a subcontractor, so that he might still have secondary workmen's compensation protection from the general contractor in the event of the failure of the subcontractor to provide it.[12] However, it has come to be repeatedly invoked by general contractors defending common law suits for negligence on the ground that their relationship to the plaintiff's immediate employer invests them, like

10. The new section (§ 205, 77 P.S. § 72) of the Workmen's Compensation Act provides: "If disability or death is compensable under this act, a person shall not be liable to anyone at common law or otherwise on account of such disability or death for any act or omission occurring while such person was in the same employ as the person disabled or killed, except for intentional wrong."

11. "An employer who permits the entry upon premises occupied by him or under his control of a laborer or an assistant hired by an employe or contractor, for the performance upon such premises of a part of the employer's regular business entrusted to such employe or contractor, shall be liable to such laborer or assistant in the same manner and to the same extent as to his own employe."

12. Qualp v. James Stewart Co., 266 Pa. 502, 509, 109 A. 780 (1920); 1 Skinner, Pennsylvania Workmen's Compensation Law (4th ed., 1947), p. 95.

him, with the immunity from a common law action which is characteristic of workmen's compensation liability.

The Workmen's Compensation Act prescribes a number of requirements before one may become responsible under it as a "statutory employer" and thus enjoy immunity from common law claims for negligence. They have been authoritatively enumerated in McDonald v. Levinson Steel Co., 302 Pa. 287, 295, 153 A. 424, 426 (1930): "(1) An employer who is under contract with an owner or one in the position of an owner. (2) Premises occupied by or under the control of such employer. (3) A subcontract made by such employer. (4) Part of the employer's regular business entrusted to such subcontractor. (5) An employee of such subcontractor."

That McShain met a number of these requirements is undisputed. It was the general contractor under a contract with Misericordia Hospital, the owner. It subcontracted the plumbing work, which included excavation, to Walters. Although not conceded specifically, it is equally clear and undenied that the plumbing work and its subordinate excavation work was part of McShain's regular business. McShain's contract with Walters to do this work was simply a letter agreement transferring to it this part of McShain's contractual obligations under the general contract with the owner. That decedent was an employee of Walters is admitted.

This left as the really disputed issue the question whether McShain occupied or controlled the premises on which decedent was permitted to enter for the performance of the work entrusted to the subcontractor or had the *right* to occupy or control the premises. See Girardi v. Lipsett, Inc., 275 F.2d 492 (3d Cir. 1960), cert. den., 364 U.S. 821, 81 S.Ct. 56, 5 L.Ed.2d 50. This question was left to the jury to determine from the evidence.

A careful review of the evidence, including admissions which were offered on both sides, makes it clear that there is no support for the jury's finding that

McShain was not the "statutory employer" of the decedent. Indeed, all of the evidence is the other way. Parker, McShain's foreman, was on the Misericordia Hospital premises overseeing various operations. There was evidence that from time to time there were conversations about the work between Parker and Subers and even that they and others agreed that no shoring of the ditch be done. Tyler, the dynamiter, another subcontractor of McShain, was working only 175 feet from the place of the cavein. There is evidence that he observed the ditch and even talked to some of those who were working at it a short time before the cave-in. He reported to McShain's foreman before and after each blast, thus giving to McShain both the preliminary warning and the subsequent all-clear signal. McShain actually was engaged in carrying out some portions of the job itself. McShain constructed a shanty on the grounds for the use of workmen. The shanty remained on the premises when Walters entered on the plumbing job. The shanty was not at some relatively remote portion of the premises; it stood athwart the place where the trench was to be dug. It was because Parker refused Subers' request to remove the shanty that the narrower trench was dug on its very edge.

Thus McShain's continued control over the shanty and its presence on the premises is overwhelmingly clear. Indeed, everything on which plaintiff relies to prove McShain's negligence shows McShain's immunity from suit as a statutory employer.

Of course, if there is any evidence to the effect that McShain did not occupy or control or have the *right* to occupy or control the premises, the disputed question of fact would be for the jury. A careful review of the record indicates, however, that there is no contradictory evidence except for what may be found in pleadings and similar documentary admissions. To these I therefore turn.

At the trial plaintiff read into evidence as an admission McShain's answer to ¶ 4(a) of Hinkle's cross-complaint in

which McShain denied that it was "in possession or control of the said ditch." It must be noted first that this answer is not a denial of the *right* to occupy or control, a right which has been held sufficient to bring one within the statute. Girardi v. Lipsett, Inc., 275 F.2d 492 (3d Cir. 1960), cert. den., 364 U.S. 821, 81 S. Ct. 56, 5 L.Ed.2d 50. Moreover, there is some question as to the propriety of admitting this item of evidence. In ¶ 3 of new matter contained in its answer to Hinkle's cross-complaint McShain alleged in its defense that it was the statutory employer. McShain argues that this allegation, which was also permitted to go to the jury, and the denial of possession or control, were inconsistent defenses, and that thus the denial should not have been allowed in evidence as an admission.[13] However, I need not decide this question, for the issue of McShain's occupancy or control over the premises was foreclosed by action taken by the parties after the pleadings were filed.

■ On the eve of trial, following a pre-trial conference, plaintiff admitted McShain's request for admission no. 3, which reads: "At the time of the accident in suit, the premises on which said accident occurred, were occupied or under the control of defendant, John McShain, Inc.". Plaintiff originally had denied this request by an answer filed more than a year earlier.

I permitted this request for admission to be read into evidence by McShain as an admission that McShain occupied or controlled the premises at the time of the accident. I believe this admission foreclosed any dispute at the trial regarding its truth. Rule 36, Federal Rules of Civil Procedure, deals with requests for admission of the genuineness of documents or of the truth of matters of fact set forth in the request. It does not, however, specifically describe the effect of an admission, or its nature. Its language, however, is significant. It is not with admissions of the truth of

items of *evidence* that the rule is concerned. It deals with admissions of the truth of matters of *fact*. Evidence is the means by which facts are proven. Requests for admission deal therefore with admissions of facts rather than the evidentiary circumstances by which they may be established. Here the decisive issue of fact between plaintiff and McShain was whether McShain occupied or had control of the premises on which the decedent had entered to perform his work and on which the accident occurred. With full knowledge of the significance of the vital request the plaintiff admitted its truth. She evidently came to do this because in the light of what she knew of the circumstances she could not in good faith dispute it. This admission is all the more significant because it was made a week or so prior to trial, after a promised answer to the request had been delayed and had become the subject of discussion at the pre-trial conference. It is even more significant because it superseded a denial of the same request, made more than a year earlier, which had been subjected to reconsideration.

Discussion of Rule 36 has been relatively meager and not free from obscurity, evidently because the Rule does not decree in so many words that a request which is admitted shall be deemed conclusive against the party making the admission. Curiously, although the Rule does not specify in so many words the effect of the admission in the pending litigation, it is careful to declare that the litigant's admission "is for the purpose of the pending action only and neither constitutes an admission by him for any other purpose nor may be used against him in any other proceeding". (Rule 36(b)). It seems to me that the draftsmen of the Rule simply felt it unnecessary to specify the obvious. Rule 36 serves a salutary purpose as one of the means for reducing the area of dispute at the trial. Requests for admission of relevant facts under Rule 36 would be even less useful than interrogatories

13. See the interesting discussion by Goodrich, J. in Giannone v. United States Steel Corp., 238 F.2d 544, 546–548 (3d Cir. 1956).

to parties under Rule 33 if they were not conclusively binding on the party making the admission. For interrogatories under Rule 33 may go beyond *relevant* facts and may deal with matters which are calculated to lead to the discovery of relevant facts.

An answer to a request under Rule 36 is unlike a statement of fact by a witness made in the course of oral evidence at a trial, or in oral pre-trial depositions, or even in written answers to interrogatories. It is on the contrary a studied response, made under sanctions against easy denials, to a request to assert the truth or falsity of a relevant fact pointed out by the request for admission. The purpose of the Rule is not the discovery of information but the elimination at trial of the need to prove factual matters which the adversary cannot fairly contest. This is analogous to the older style pleading in which so-called ultimate facts were alleged under oath by the plaintiff and were conclusively taken to be true unless specifically denied by the defendant. Having adopted a simpler form of pleading the Federal Rules preserved in the request for admission the means for obtaining a conclusive admission of any relevant fact and did not limit the remedy to so-called "ultimate" facts. Were this otherwise then the much vaunted improved Federal Rules would be without a well-known and useful mode of limiting the factual disputes, and this under a system which has reduced the significance of pleadings as the means of limiting issues of fact.

Language in textbooks [14] and decisions [15] declaring that admissions under Rule 36 have the effect of "sworn testimony" serve to confuse the problem.[16] In every case such language either was dictum,[17] or the problem of the binding effect of answers to requests for admission was not presented,[18] or there were present peculiar circumstances not here involved.[19] One case [20] which is cited in all the subsequent decisions starts with the assumption that answers to requests for admissions "stand in the same relation to the case that sworn evidence bears", emphasizing that such answers must be sworn to and signed by the litigant himself. But the presence of the party's oath in both instances, with its sanction of the penalty for perjury, does not make an admission of a request the same in all respects as sworn testimony. For requests for admission, although answered under the oath of a party, are normally made under the direction and supervision of counsel, who has full professional realization of their significance.[21] Therefore, their similarity to sworn testimony in one respect should not reduce their effect from conclusive admissions to merely evidential ones.

Plaintiff seeks to distinguish between occupancy or control of the *premises,* which she conceded in answer to McShain's request for admission, and occupancy or control of the *ditch,* which

14. 4 Moore, Federal Practice (Supp. 1963) ¶ 36.08; cf. 2A Barron & Holtzoff, Federal Practice & Procedure (1961), § 838.

15. See Ark-Tenn Distributing Corp. v. Breidt, 209 F.2d 359, 360 (3d Cir. 1954); Dorsey v. Reconstruction Fin. Corp., 197 F.2d 468, 472 (7th Cir. 1952); United States v. Lemons, 125 F.Supp. 686, 688 (W.D.Ark.1954); Sieb's Hatcheries, Inc. v. Lindley, 13 F.R.D. 113, 119 (W.D.Ark. 1952); Dulansky v. Iowa-Illinois Gas & Elec. Co., 92 F.Supp. 118, 123 (S.D.Iowa 1950); Beasley v. United States, 81 F. Supp. 518, 528 (E.D.S.C.1948).

16. See Finman, The Request for Admissions in Federal Civil Procedure, 71 Yale L.J. 371, 421–22 (1962).

17. See Ark-Tenn Distributing Corp. v. Breidt, 209 F.2d 359 (3d Cir. 1954).

18. See Dorsey v. Reconstruction Fin. Corp., 197 F.2d 468 (7th Cir. 1952); Sieb's Hatcheries, Inc. v. Lindley, 13 F.R.D. 113 (W.D.Ark.1952); Dulansky v. Iowa-Illinois Gas & Elec. Co., 92 F.Supp. 118 (S.D.Iowa 1950); Beasley v. United States, 81 F.Supp. 518 (E.D.S.C.1948).

19. See United States v. Lemons, 125 F. Supp. 686 (W.D.Ark.1954).

20. Beasley v. United States, 81 F.Supp. 518 (E.D.S.C.1948).

21. Curiously, the admission here was made by counsel's letter and not on the oath of the plaintiff. However, the parties have waived this informality.

McShain denied in its answer to Hinkle's cross-complaint. Certainly the premises which the plaintiff conclusively admitted were occupied or under the control of McShain included the ditch where the plumbing subcontract was being carried out and which was on the very edge of McShain's shanty.

To be in control of the "premises", the statutory employer need not have one of his own immediate employees present at the precise point on the premises where the accident occurred. It is enough if the premises over which Mc-Shain exercised occupancy or control, or the right thereto, included the ditch where the work happened to be done on the day of the accident. The ditch was a part of the premises onto which the plaintiff's decedent was permitted to enter as the employee of the subcontractor. The plumbing subcontractor was required not merely to dig a ditch and lay underground sewers therein; the work in the ditch was a portion of an extensive plumbing subcontract culminating in the plumbing work within the new addition itself. The area of activity of the plumbing subcontractor, and consequently the premises upon which its employees were permitted to enter to perform the work of the subcontract, embraced a substantial part of the grounds and included the new building to be erected. It would therefore be artificial to attempt to isolate the ditch where the accident itself occurred from the premises on which the subcontractor was engaged to do its work.

The factual evidence therefore points overwhelmingly to a finding of statutory employer. This was left to the jury. But since that issue had been removed from controversy by plaintiff's admission of McShain's request no. 3, it is clear that McShain's motion for judgment notwithstanding the verdict against it must be granted.

5. *Tyler.*

Tyler was employed by McShain to do blasting in connection with the excava-

tion of an elevator shaft in the new addition to the hospital building. There was evidence that Tyler had been on the premises for approximately two weeks prior to the accident and had been doing blasting from time to time. There was evidence also that Tyler had set off a blast of dynamite two to five minutes prior to the cave-in. Plaintiff called an expert who gave his opinion that this charge was the immediate cause of the cave-in of the unshored ditch.

Tyler makes three attacks on the verdict against him. First, he claims that the trial judge erred in instructing the jury that he was engaged in an ultrahazardous activity which brought into operation the doctrine of liability without fault. Second, he attacks the opinion of the expert as invalid. Finally, he contends that there is no basis for a finding that his dynamiting contributed to the cave-in.

Tyler argues that in Pennsylvania blasting is not ultrahazardous per se. There can be no doubt, however, that Pennsylvania has fully adopted the Restatement of Torts view of ultrahazardous activities.[22] The Restatement defines blasting as ultrahazardous (§ 520, comment (c)), and fixes liability for the "miscarriage of the [ultrahazardous] activity * * * although the utmost care is exercised to prevent the harm." (Restatement of Torts, § 519).

Plaintiff's expert, Edgar, was held qualified by the trial judge to express an expert opinion. The credibility of his opinion was left to the jury. In this I find no error, however views may differ as to the weight of his testimony.

It is claimed that the hypothetical question put to Edgar included important facts for which there is no support in the record and that material facts were omitted. First, the facts assumed in the hypothetical question, including the blasting prior to the accident and the number of dynamite sticks and caps used, could fairly have been found from

---

22. Federoff v. Harrison Construction Co., 362 Pa. 181, 66 A.2d 817 (1949); see also Haddon v. Lotito, 399 Pa. 521, 161 A.2d 160, 81 A.L.R.2d 1199 (1960).

the testimony already adduced. Next, it is true that the hypothetical question did not include some elements contained in the evidence. But it was not necessary to include in the hypothetical question any factual elements except those on which plaintiff was relying. If there was evidence the other way Tyler had full opportunity to bring it to the expert witness' attention in the course of his extensive cross-examination.[23]

■ As to causation, the jury accepted the plaintiff's view and there was much evidence to support it. There is no denial that Tyler did blasting; he knew of the work going on in the ditch; he knew that it was unshored and that it was dug on the very edge of the shanty; he gave notice to the men in the ditches by having a whistle blown before the blast was set off. There was evidence of the movement of gravel in other excavations on a number of occasions immediately after blasting operations and even of cracks in the earth. The cave-in occurred two to five minutes after Tyler had set off a blast. It is true that he claimed that he used a small amount of dynamite because of the proximity of his blasting operation to the hospital itself and that there is no evidence of any repercussions within the hospital building. We do not know, however, the nature of the construction of the hospital building and whether its design was such that it more readily absorbed the effects of blasting than did the open earth, even though the latter was farther away.

In any event, all this presented a question of fact for the jury's resolution and there is nothing which would justify my setting the verdict aside.

II

ASSUMPTION OF RISK AND CONTRIBUTORY NEGLIGENCE

■ A number of the defendants earnestly contend that plaintiff is barred because the decedent assumed the risk of going into the unshored trench. They complain that the trial judge refused to submit this question to the jury. Related to this is the claim that it was error to charge that contributory negligence must be based on conduct beyond the decedent's entrance into the ditch knowing it was unshored.

The statute (Act of May 18, 1937, P.L. 654, § 2(f), as amended, 43 P.S. § 25-2 (f)), provides: "All * * * trenches, excavations, and similar operations shall be properly shored, braced, and otherwise guarded, operated, and conducted as to provide reasonable and adequate protection to *workers employed* therein". It authorizes the Department of Labor and Industry to make rules and regulations (§ 12, 43 P.S. § 25-12). It prescribes penalties of fine, and in default of payment thereof, imprisonment, increased on the second offense, and violation is declared a misdemeanor on the third offense, punishable by fine or imprisonment, or both, at the discretion of the court. (§ 15, 43 P.S. § 25-15). The defendants claim that a provision of the Foreword that the regulations shall be understood "to place the responsibility of complying with the rules upon both the employer and employe", means that the decedent, as an employee, was bound by the regulations and in violating them was *guilty both of contributory negligence and assumption of risk.*

The regulations themselves are couched in positive terms of what is to be done but do not specify the person or persons upon whom the duty is fastened. This omission is in part supplied by § 1 of the regulations, entitled "Administration". The language here, particularly in subsection (c), makes it clear that employees must use safeguards and safety appliances furnished for their protection; but both this section and the remainder of the regulations contain no language which could fairly be construed to impose the duty of shoring on every employee.

23. See Gillman v. Media, M., A. & C. E. Ry. Co., 224 Pa. 267, 274, 73 A. 342 (1909); First Nat. Bank of Easton v. Wirebach's Ex'r, 106 Pa. 37, 44 (1884); 2 Wigmore, Evidence (3d ed. 1940), § 682.

The omission can readily be understood. Shoring is not an isolated act which each individual employee could carry out, as is the case for example with the use of goggles or other safety devices which an employer must supply to employees. As illustrated by the present case, shoring is a basic part of an excavation operation, and it would be disruptive of any organized activity if each employee could decide for himself whether or not to shore. In this case the decision was made at a higher level, by McShain's superintendent with Walters' superintendent and Hanigan. To assume that the regulations brought into this decision-making level all of the artisans or workers would be out of harmony with their practical requirement and purpose. The over-all purpose of the regulations, as stated in the Foreword, is: "To set forth rules to safeguard the life, limb, and health of workers who are engaged in trench and excavation work." The statute under which the regulations are promulgated is entitled, "An Act to provide for the safety and to protect the health and morals of persons *while employed* * * *".

The statute and regulations intended for the protection of decedent and for the maintenance of a safe place for him to do his work would be subverted by a construction that would make him guilty of a summary offense or a misdemeanor because his employer, Walters, had contracted with Hinkle, and through him with Hanigan, to dig the excavation without making any provision for shoring. The imposition of criminal responsibility upon decedent is not lightly to be reached by construction of a statute whose purpose was to assure him a safe place to work.

The doctrine of assumption of risk is obscured in debate and confusion in nomenclature. (See Restatement of Torts 2d, Tentative Draft No. 9, Chapter 17A). The courts, however, have clearly recognized that an employer who violates a statutory provision which fastens a duty upon him for the protection of his employees may not assert in his defense the claim that the employees are barred from recovery because they voluntarily assumed the risks to which he exposed them.[24] Defendants maintain that this restriction on the defense of assumption of risk applies only when an injured party is suing his employer. It is true that in most of the Pennsylvania cases in which statutory violation has been held to preclude use of the defense the parties have been in an employment relationship.[25] But the problem is not to be determined in this evolving area of the law by technical or strict considerations of employer-employee relationship. Manifestly the digging of excavations is often done by one subcontractor and the plumbing installed by another subcontractor, as happened in this case. It has long been required by statute in Pennsylvania that in public contracts separate bids be invited on plumbing, heating, ventilating and electrical work (Act of May 1, 1913, P.L. 155, § 1, 71 P.S. § 1618). The splitting of private jobs into various subcontracts is also an everyday practice. It is therefore common for workmen employed by various subcontractors to be on the job at the same time. It would do violence to the beneficent purpose of protecting the safety of workmen if their protection were to be narrowly confined to the statutory violations of their immediate employer and did not include those of other subcontractors working on the same premises at the same time with them. Here the work of Hanigan and Walters was intimately related, indeed correlated. To say that because the decedent was not an employee of Hanigan the protection of the statute and regulations is to be denied him on grounds of assumption of risk, although it would not be so denied were there an employment relationship, would be to create an artificial distinction which no

24. See, e. g., Price v. New Castle Refractories Co., 332 Pa. 507, 3 A.2d 418 (1939) ; Valjago v. Carnegie Steel Co., 226 Pa. 514, 75 A. 728 (1910).

25. But see Soley v. Nelson, 12 Pa.Dist. & Co.R.2d 90, 101 (1957), involving a student injured using trade school's machinery.

Pennsylvania case has expressly accepted and which I think, if now presented to the Pennsylvania courts, would be resolved in favor of the public policy which underlies the statute.

The view taken in the charge on assumption of risk necessarily affected the charge on the defense of contributory negligence. The jury was permitted to consider all the relevant circumstances[26] in determining whether the decedent was guilty of contributory negligence in entering and working in the trench. But they were not permitted to fasten any responsibility on him merely because the trench that he entered and worked in was unshored, since the duty of shoring was not his, but the defendants'.[27] To allow such a defense, which had already been rejected under assumption of risk, to be subsumed under contributory negligence would make meaningless the rejection of assumption of risk and defeat the statutory purpose on which that rejection was founded.[28]

## III

### THE BURDEN OF PROOF

The unexpected claim is made by Hanigan that it was error to charge that the defendants had the burden of proving plaintiff's contributory negligence by a

26. There was evidence of the quality of the soil, the dynamiting nearby, cracks in some nearby ditches, sliding of sand in other ditches, and taunting by Tyler of those who were in the ditch.

27. "Now, although Kane was working in that trench or ditch, and was a worker, and was an employee of Walters, I charge you, members of the jury, that the requirement of shoring or funneling was not placed upon Kane, the decedent.

"On the contrary, that requirement of the statute and the regulations was for his protection. And therefore you may not consider the violation of the statute by those who dug the ditch and had the responsibility for seeing to the shoring—even if they didn't dig the ditch—you may not include Kane among them. He is a beneficiary of that statute and is not to be held guilty of contributory negligence because of its violation.

"Again, he is not to be held contributorily negligent by you because he went into a ditch to work, even though the ditch had not been shored, and therefore was built in violation of the statute or regulations.

"It is only if, as a workman already entitled to do his work under the circumstances provided by his employer, namely, an unshored ditch, it is only if, beyond that, there was some conduct of his which was negligence and careless. Only in such circumstances, weighing all of that evidence—whatever it may be—along with the presumption of due care, that you may determine whether he was guilty of contributory negligence—or, to put it more accurately, whether you were satisfied by the fair preponderance of the evidence that he was contributorily negligent." (Charge, Transcript, 1510–11).

28. Pennsylvania cases which have barred the defense of assumption of risk in cases of statutory violation have not always excluded contributory negligence. See, e. g., Price v. New Castle Refractories Co., 332 Pa. 507, 3 A.2d 418 (1939); Hoffman v. Brentmore Knitting Mills, 252 Pa. 337, 97 A. 474 (1916); DiMagnio v. Jefferson & Clearfield Coal & Iron Co., 251 Pa. 321, 96 A. 746 (1916); Jones v. American Caramel Co., 225 Pa. 644, 74 A. 613 (1909). But it is important to note that in these cases the contributory negligence that remained after assumption of risk had been removed consisted of acts independent of and not subsumed under the conduct that had constituted the alleged assumption of risk. For example, in Price v. New Castle Refractories Co., supra, the assumption of risk was the decision to continue to work in a factory where statutory requirements relative to industrial dust control were not being observed; however, the contributory negligence that remained to bar the plaintiff's recovery was the failure to wear a safety mask provided.

There are other Pennsylvania cases where the same act by plaintiff could be deemed to be within the scope of both defenses and where the act was allowed to bar the claim on grounds of contributory negligence. See, e. g., Hoffman v. Brentmore Knitting Mills, 252 Pa. 337, 97 A. 474 (1916); Solt v. Williamsport Radiator Co., 231 Pa. 585, 80 A. 1119 (1911). But a close reading of such cases usually discloses that the contributory negligence involved took the form of doing an act in a dangerous way when a safe way was available to the plaintiff. Plaintiff's decedent did not have such an option.

*"fair"* preponderance of the evidence. The use of the word "fair" is claimed to be "misleading" because it suggests something more than a simple preponderance of the evidence. The objection certainly has the element of novelty. It requires some notice, since it involves language in common use in instructions to juries.

I see no misleading quality in the use of the adjective indicating an absence of bias and the presence of the element of fairness. Although of course the absence of the adjective would not be error,[29] the "fair preponderance of the evidence" is a phrase that has been used from time immemorial. In Se-Ling Hosiery, Inc. v. Marguiles, 364 Pa. 45, 48–49, 70 A.2d 854, 856, (1950), Chief Justice Maxey recognized "the established practice [in civil cases] for the trial judge to say that not only has the plaintiff the burden of proof but also that this proof must be by the fair preponderance of the evidence * * *; and the least degree of proof any claimant can offer in order to obtain persuasion is proof which *fairly outweighs* the probative value of any proof offered against the claim. If the evidence does not fairly preponderate in favor of his claim he has failed to carry his burden of proof." He declared that "the safest course for a judge in charging the jury in such cases would be to adhere to the long established formula and say that the plaintiff has the burden of proving his claim by the fair preponderance of the evidence". (364 Pa. at 51, 70 A.2d at 856). (Italics in original).

In Miller v. Exeter Borough, 366 Pa. 336, 339, 77 A.2d 395, 397 (1951), the Pennsylvania Supreme Court said: "The statement of the trial judge that plaintiff's burden of proof must be met by 'the fair weight of the credible testimony' instead of 'the fair preponderance of the evidence', a phrase more customarily used, and recommended for use by the late Chief Justice Maxey in Se-Ling Hosiery, Inc. v. Margulies, 364 Pa. 45, 70

A.2d 854, does not constitute error. Both phrases convey the thought that proof on one side of a cause must fairly outweigh the proof on the other."

Many aspects of the problem of burden of proof in civil cases are reviewed in Burch v. Reading Company, 240 F.2d 574 (3d Cir.1957). In the course of a careful analysis of the metaphorical cliches in common use Judge Maris said: "But we do not think it is wrong to say, as the trial judge in this case did, that the jury must be *convinced* by the fair preponderance of the evidence that the facts were as the plaintiff asserted them to be." (240 F.2d p. 579). (Italics in original). Judge Kalodner, dissenting as to the use of the word "convinced", referred to the Se-Ling case with apparent approval. (240 F.2d p. 583).

As late as the yet unreported opinion of our Court of Appeals in United States of America v. 60 28-Capsule Bottles, etc., 3 Cir., 325 F.2d 513, decided December 3, 1963, the court held that the proper evidentiary standard to be applied in misbranding actions by the United States is that it must prove its contention by "a fair preponderance of the evidence. * * * The appellate cases considering the question under the * * * Act adopt the fair preponderance of the evidence criterion [citing authorities]".

In any event, a matter of this kind is one which peculiarly required that any complaint be called to the attention of the trial judge. (F.R.Civ.P. 51. See also Se-Ling Hosiery, Inc. v. Margulies, 364 Pa. 45, 51–52, 70 A.2d 854 (1950)). The requirement is especially applicable here, because the charge used the same language in describing the plaintiff's burden of proof, and defendants made no objection.

## IV

### THE VERDICT

The jury was instructed that in the case against the four defendants it should bring in separate verdicts on the

29. See 32 C.J.S. Evidence, § 1021, noting that the expressions "clear preponderance" and "full preponderance" have been condemned for adding to the burden of proof, whereas "fair preponderance" is generally upheld.

wrongful death and survival claims, and a separate verdict in the survival action against Subers (Transcript, 1517-18). Specifically, instruction was given that the amount of any verdict for the plaintiff in the survival actions should be the same as to Subers as to any other defendant.

The jury found against all four defendants in the one action and announced verdicts of $35,000 for the wrongful death claim and $100,000 for the survival claim. In the survival action against Subers the forelady announced a verdict against defendant of $100,000, but two of the jurors immediately objected that this was erroneous. (Transcript, 1584). A colloquy followed in open court to ascertain the jury's intention. The clerk then asked the jurors to hearken to their verdict as it was recorded, reciting a verdict against all four defendants of $35,-000 on the wrongful death claim and of $100,000 on the survival claim, and in the same amount of $100,000 against Subers. Two jurors again objected that this was incorrect. One of them said that they did not arrive at a separate figure for Subers but that the $100,000 was to include all five defendants. (Transcript, 1586-87). Another juror declared: "We meant the five would pay the $100,000." (Transcript, 1587). When some of the jurors objected to the verdict as the crier recited it, the trial judge inquired whether the forelady was able to state the amount of the jury's verdict against Subers in the survival action. The forelady replied that the jury had not agreed on an amount in the Subers case although they had determined on a verdict against him.[30] Attention of the jury was direct-

ed to the rule that the plaintiff could have but one recovery no matter how many defendants were found liable. (Transcript, 1596-97).

After further deliberation the jury returned with a verdict of $20,000 against Subers in the survival claim. On a poll of the jury the forelady stated that the damages assessed in the survival claim against the four defendants were $80,-000. That this was a change from the previously announced verdict of $100,000 was specifically called to the jury's attention by the trial judge, and this was acknowledged by the forelady. All the jurors were then polled, and they agreed to a verdict of $35,000 in the wrongful death claim and $80,000 in the survival claim against the four defendants. The clerk then proclaimed the verdict as recorded and the jurors all agreed to it. The verdict of $20,000 against Subers in the survival action was then proclaimed and all the jurors agreed to it. (Transcript, 1611-13).

The verdicts of $80,000 in one action and $20,000 in the other when both verdicts purported to measure the same damages in survival claims are obviously improper. The plaintiff has moved to mold the survival verdicts by increasing them to $100,000 against each of the five defendants, including Subers. This she claims would effectuate the true intention of the jury as revealed by their statements in open court.

It is one thing to mold a verdict where the jury's intention is clear but there is some irregularity in its pronouncement.[31] But two equally likely but incompatible objectives emerge from the jurors' expressions in open court. The jury ap-

---

30. "Now, can your forelady on your behalf state what is the amount of your verdict in the suit against Subers, which is simply for the survival action and not for wrongful death?

"JUROR NO. 1: Your Honor, we don't have that amount. I am sorry.

"THE COURT: You have no amount for that?

"JUROR NO. 1: No, sir.

"THE COURT: Were you able to agree on a verdict as to the Subers case?

"JUROR NO. 1: Well, we found him guilty.

"THE COURT: Then you have not arrived at an amount; is that right?

"JUROR NO. 1: No, sir.

"THE COURT: Well, then, if you haven't arrived at an amount, then you can't complete your verdict; isn't that correct?

"JUROR NO. 1: I guess we can't." (Transcript, 1592-93).

31. See 89 C.J.S. Trial, §§ 515, 517c.

parently wished the plaintiff to receive $100,000 in the survival action, but wanted each of the five defendants to pay no more than $20,000 for this purpose. Evidently the jury persisted in its notion that the plaintiff could recover $20,000 from each of five defendants. It is impossible to be certain what amounts would have been assessed had the jury applied the trial judge's instructions relating to the joint and several liability of all the defendants with its consequence that execution could issue against any individual defendant for the full amount of the verdict.

Although the jury sought to accomplish what it thought was a just result, it is clear that it failed to perform its proper function in assessing damages. It did not pronounce a verdict which is consistent as to the various defendants. Such an inconsistent verdict which manifests the jury's failure to follow the court's instructions cannot stand.[32] I cannot attempt to correct the inconsistency under Rule 59(e) for I have no confidence that any choice I might make is the one which the jury would have approved. Litigants are entitled to a trial by jury (cf., Byrd v. Blue Ridge Rural Elec. Cooperative, Inc., 356 U.S. 525, 537–538, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958)), and this means a jury's verdict and not the court's. It would be an invasion of the jury's function rather than the correction of a formal defect to create consistency by increasing the verdict against Subers to $80,000, or by increasing both verdicts to $100,000, as plaintiff has proposed.

■■■ The parties disagree whether the setting aside of the verdicts in the survival actions requires that the verdict in the wrongful death action must also fall. It is impossible to exclude the likelihood that the jury took into consideration its award in the survival actions when it fixed its verdict in the wrongful death action. The two are so related that the courts have held that verdicts on both claims may be considered in determining the adequacy of each, and the manner in which they may have been apportioned is of no consequence when the recipients are identical. See Siidekum, Admr. v. Animal Rescue League, 353 Pa. 408, 45 A.2d 59 (1946); Martin v. Swift, 258 F. 2d 797 (3d Cir.1958). I believe that justice requires that the entire question of damages should be resubmitted for a jury's fresh determination.[33]

■■■ There remains the question whether a new trial granted because of defects in the verdicts on damages may be limited to that question in view of the clear liability of all the defendants after judgment n. o. v. is entered for McShain.

Rule 59(a) authorizes the granting of a new trial "to all or any of the parties and on all or part of the issues * * * for any of the reasons for which new trials have heretofore been granted in actions at law in courts of the United States * * *."[34] Clearly the granting of a new trial limited to the issue of damages is appropriate where the damage issue is in no way linked with a liability issue.[35] In the present case there is no claim that the verdicts announced were inadequate; on the contrary, the defendants claim that they were excessive, a subject which it has not become necessary to decide. The verdicts show that the amount of damages was not the subject of compromise consideration by the jury on account of

---

32. Colonell v. Goodman, 78 F.Supp. 845 (E.D.Pa.1948), Kirkpatrick, J., aff'd. 169 F.2d 275 (3d Cir.), cert. den., 335 U. S. 870, 69 S.Ct. 166, 93 L.Ed. 414.

33. I need not, therefore, deal separately with the contention, based mainly on the forelady's declaration that only $5,000 was for "anguish" (Transcript, 1585), that the verdicts were excessive.

34. On the propriety of a new trial limited to damages, see Cromling v. Pittsburgh & Lake Erie R. R. Co., 327 F.2d 142 (3d Cir. 1963); Darbrow v. McDade, 255 F. 2d 610 (3d Cir. 1958); Yates v. Dann, 11 F.R.D. 386 (D.Del.1951); Tompkins v. Pilot's Ass'n., 32 F.Supp. 439, 441 (E.D.Pa.1940), Kirkpatrick, J.

35. See 6 Moore, Federal Practice (2d ed. 1953), ¶ 59.06.

any serious doubts as to liability.[36] This is peculiarly a case therefore where it is proper to sever the damage question, which the jury was confused in solving, from the liability issue on which it acted decisively. It happens that it is also of practical desirability, for the evidence on damages was a relatively brief part of a two-week trial.

Even under Pennsylvania law—which is not decisive here—a partial new trial limited to the question of damages may be granted in these circumstances in the discretion of the trial judge.[37] The rule is not to be misunderstood or thought abandoned because of recent decisions in Pennsylvania which have overturned the grant of a partial new trial limited to damages. See Phelps v. Paul L. Britton, Inc., 412 Pa. 55, 192 A.2d 689 (1963); Friedman v. Matovich, 191 Pa.Super. 275, 156 A.2d 608 (1959); Mains v. Moore, 189 Pa.Super. 430, 435, 150 A.2d 549 (1959). In the Phelps and Mains cases it was clear that the jury had rendered a compromise verdict because its doubts as to liability had percolated into the conclusion on damages. Similarly, in the Friedman case the verdict in favor of the plaintiff for $1 was so unusual and obviously inadequate that the court declared on appeal that "it is not realistic to assume that the jury deliberately and conclusively settled the question of liability and was confused only concerning the amount involved." (191 Pa.Super. at 281, 156 A.2d at 611).

I shall therefore grant a new trial limited to damages in the survival claim against Subers and in the wrongful death and survival claims against all the defendants except McShain, who will be eliminated by the entry of judgment in its favor n. o. v.

## ORDER

And now, December 27, 1963, the motions of the defendants, John Hanigan, Individually and trading as Hanigan Construction Company, Walter Hinkle, In-dividually and trading as Hinkle Excavation Company, Robert R. Tyler, Individually and trading as Robert F. Tyler and Company, and Edward Thomas Subers, for a new trial and for judgment n. o. v. are severally denied.

The motion of defendant, John McShain, Inc., for a new trial is denied; the motion of defendant, John McShain, Inc., to set aside the verdict and judgment entered thereon is granted and judgment is directed to be entered in favor of defendant, John McShain, Inc., notwithstanding the verdict.

The motion of the plaintiff, Stella McSparran, Administratrix of the Estate of Ignatius Peter Kane, Deceased, to mold the verdicts and amend the judgments is denied; and the alternative motion of the plaintiff for a new trial limited to the issue of damages is granted, and such new trial shall include the claims for wrongful death and for survival.

36. See generally Annotation, 29 A.L.R.2d 1199 (1953).

37. See, e. g., Hanus v. K. M. B. Construction Co., 392 Pa. 307, 140 A.2d 454 (1958).