Howard **JAMISON**, Administrator of the Estate of Jesse Click, Deceased,

v.

**WESTINGHOUSE ELECTRIC CORPORATION, a Pennsylvania Corporation, Appellant.**

**No. 15908.**

United States Court of Appeals Third Circuit.

Argued Oct. 6, 1966.

Decided March 28, 1967.

Frederick N. Egler, Pittsburgh, Pa. (Egler, McGregor & Reinstadtler, Pittsburgh, Pa., on the brief), for appellant.

William W. McVay, Pittsburgh, Pa. (James E. McLaughlin, John M. Tighe, McArdle, Harrington, Feeney & McLaughlin, Pittsburgh, Pa., on the brief), for appellee.

Before FORMAN, FREEDMAN and SEITZ, Circuit Judges.

## OPINION OF THE COURT

FREEDMAN, Circuit Judge:

The issue in this diversity case is whether defendant Westinghouse was the statutory employer of decedent under the provisions of the Pennsylvania Workmen's Compensation Act.

Decedent, a painter, fell to his death when the scaffold on which he was standing collapsed while he was painting the ceiling of a building on the site of the Bettis Atomic Laboratory. He was an

employee of the Eichleay Corporation, which was on the premises under a contract with Westinghouse for the "renovation, relocation, and installation of machinery and services to provide for consolidation of the Bettis and Clairton Sites of the Bettis Atomic Power Laboratory." Westinghouse had the use and control of the premises by virtue of an agreement with the Atomic Energy Commission, under which it was performing research and development work in atomic energy for the Government. The record gives no indication why Westinghouse arranged to consolidate the two sites of the Laboratory. Westinghouse contends, however, that the painting activity in which decedent was engaged was an obligation imposed on it under its agreement with the Atomic Energy Commission.[1]

The administrator of decedent's estate brought suit against Westinghouse for its negligence in erecting the scaffolding from which decedent fell. Three trials followed. On the first trial a verdict for Westinghouse was set aside because certain inadmissible documents had been introduced into evidence. At the second trial plaintiff recovered a judgment for separate claims under the Pennsylvania wrongful death and survival statutes. This, however, was set aside because of the inadequacy of the evidence to support the award of damages; a new trial was ordered on damages and Westinghouse's

motion for judgment n. o. v. was refused. At the third trial both parties agreed that the proper amount of damages was $63,-762.00 on the wrongful death claim and $1,238.20 on the survival claim. Westinghouse then renewed its motion for judgment n. o. v. on the ground that it was the statutory employer of decedent and that plaintiff therefore had no remedy outside the Pennsylvania Workmen's Compensation Act. The motion was denied and this appeal followed.

■ Section 203 of the Pennsylvania Workmen's Compensation Act [2] provides: "An employer who permits the entry upon premises occupied by him or under his control of a laborer or an assistant hired by an employe or contractor, for the performance upon such premises of a part of the employer's regular business entrusted to such employe or contractor, shall be liable to such laborer or assistant in the same manner and to the same extent as to his own employe." In construing this section the Pennsylvania Supreme Court held in the leading case of McDonald v. Levinson Steel Co., 302 Pa. 287, 295, 153 A. 424, 426 (1930), that it is necessary to prove the existence of five elements to establish statutory employment: "(1) An employer who is under contract with an owner or one in the position of an owner. (2) Premises occupied by or under the control of such employer. (3) A subcontract made by such employ-

---

1. Three provisions of the agreement are particularly significant regarding this claim.

   Article IX, Section 2a provides: "Westinghouse shall take all reasonable measures, in accordance with applicable regulations and with policies and procedures developed by mutual agreement between Westinghouse and the Commission, or in the absence of any of the foregoing in accordance with sound industrial practice, to protect from loss or damage and shall, subject to the provisions of Section 5 of this Article IX, keep in good operating condition and repair all such Government property."

   Article IX, Section 5 provides: "Westinghouse shall not be liable for loss or destruction of or damage to Government property in its possession or control unless such loss, destruction or damage

results from wilful misconduct or lack of good faith on the part of Westinghouse's managerial personnel, or unless such loss, destruction or damage results from a failure on the part of Westinghouse's managerial personnel to take all reasonable steps to comply with any appropriate written directives of the Contracting Officer to safeguard such property under Section 2 of this Article IX. * * *"

   Article XIX provides: "Westinghouse shall take all reasonable precautions in the performance of the work under this contract at the Laboratory to protect the health and safety of employees and of the public and to minimize danger from all hazards to life and property. * * *"

2. Act of June 2, 1915, P.L. 736, § 203, 77 Purdon's Pa.Stat.Annot. § 52.

er. (4) Part of the employer's regular business entrusted to such subcontractor. (5) An employee of such subcontractor." The parties here have conceded the existence of four or these five elements; the only question presented is whether the painting activity performed by decedent fell within the fourth requirement and was part of Westinghouse's "regular business."

At the second trial, where liability was finally decided by the jury, the district judge submitted to it the following interrogatory on the issue of statutory employment: "Was a part of the regular business of the defendant, Westinghouse Electric Corporation, as a contractor under the Atomic Energy Commission contract, entrusted to Eichleay as the subcontractor, during which time the deceased met his death?" The jury answered in the negative. Both parties agreed to the form and substance of the interrogatory and no objection to it or to the manner of its submission to the jury is raised here. The single question before us is whether the evidence requires the conclusion as a matter of law that Westinghouse was decedent's statutory employer.

■ Thirty-nine of the fifty states have "statutory employer" provisions, although they differ widely in the requirements which must be met. The general purpose of such statues is to afford workmen's compensation protection to injured employees of uninsured contractees by imposing secondary liability therefor upon the contractor who let out the work. The requirement that the work performed by the employees of the contractee must be part of the "regular business" of the contractor emphasizes the purpose of the statute to prevent evasion of the Act by an employer through the device of sub-

contracting its regular operations and thereby avoiding direct employment relations with the workers and making them dependent on their immediate employer for compensation. See generally 1A Larson, Workmen's Compensation (1966), § 49.11; Qualp v. James Stewart Co., 266 Pa. 502, 509, 109 A. 780, 782 (1920).

■ In implementing this legislative policy, courts have interpreted the "regular business" requirement as embracing all activities which are normally carried on through employees rather than through independent contractors.[3] Under this test, painting activities such as those involved here ordinarily have not been considered part of a contractor's "regular business."[4] Thus, under the usual standard, decedent's activities would not make him a statutory employee of Westinghouse.

What remains, however, is the question whether the painting activities, although not of a type usually considered part of Westinghouse's regular business, became so because they were within the obligations imposed upon it by its contract with the Atomic Energy Commission. Although under the statutory language the sole test seems to be whether the work entrusted to Eichleay was part of Westinghouse's regular business, in the sense of work which it normally undertook to do itself, the Pennsylvania courts have indicated that the statutory requirement is satisfied wherever the subcontracted work was an obligation assumed by a principal contractor under his contract with the owner. A clear illustration is the case of a general construction contractor all of whose obligations are fixed in the contract with the owner and who obviously will subcontract various portions of his contractual obligation.[5] In such a case, while the principal con-

3. 1A Larson, supra, § 49.12. See also Allen v. Babcock & Wilcox Tube Co., Inc., 356 Pa. 414, 416–417, 52 A.2d 314, 316 (1947); McGrath v. Pennsylvania Sugar Co., 282 Pa. 265, 269–270, 127 A. 780, 781–782 (1925); Hauger v. H. W. Walker Co., 277 Pa. 506, 121 A. 200 (1923).

4. See, e. g., Amerada Petroleum Corp. v. Vaughan, 200 Okl. 226, 192 P.2d 639 (1948); Rucker v. Blanke Baer Extract & Preserving Co., 162 S.W.2d 345 (Mo. App.1942). See also 1A Larson, supra, § 49.12 at p. 728.

5. See, e. g., McSparran v. Hanigan, 225 F.Supp. 628 (E.D.Pa.1963), aff'd, 356 F. 2d 983 (3 Cir. 1966).

tractor may not directly perform a particular part of his general obligation, choosing instead to subcontract it, nevertheless he may accurately be said to be in the business of assuming the broad obligations of a principal contractor and therefore equally to be in the business of letting out portions of his undertaking to others to perform on his behalf. To construe the subject matter of the subcontract as outside the principal contractor's regular business would be to reduce the scope of his undertaking as a principal contractor. It would, moreover, permit evasion of the purpose of the statutory provision by denying employees workmen's compensation protection in a numerous class of cases which has wide ramifications. This policy was expressed in Qualp v. James Stewart Co., supra, very shortly after the act was adopted. "The Legislature wanted to definitely fix some responsible party with the obligation of paying compensation to injured workmen, and the party selected was the first whose duty it was to assume control of the work. It selected the first in succession from the owner, believing the owner would contract with none but responsible persons. He was the first in the field and in the contracting scheme of work, the head of the endeavor, the person to whom an employee would naturally look. * * * The act intended to throw the burden on the man who secured the original contract from the owner to the end that employees of any degree doing work thereunder might always be protected in compensation claims."

■ The policy which underlies these cases, however, is inapplicable where the obligation imposed by a contract with the owner cannot be traced to the general activity of the contractor, but rather is incidental to the maintenance of the premises, and involves work which the owner cannot have performed for him by one who generally deals in that activity, as he ordinarily would do, because of the contractor's occupancy or control of the premises.

■ The circumstances in this case show clearly that the contract between Westinghouse and the Atomic Energy Commission was not entered into because of Westinghouse's ability to maintain the premises. The contract called on Westinghouse to perform important secret atomic research, and the provision for the maintenance of the premises was an incidental consequence of Westinghouse's occupancy and control of the Laboratory. Westinghouse had been in possession of the Laboratory for more than eleven years at the time the accident occurred and during that time it was for all practical purposes in the position of the owner. The complete control which Westinghouse exercised is demonstrated by its contract with Eichleay by which Westinghouse undertook, apparently on its own initiative, to consolidate two of the sites of the Laboratory, an act which is hardly typical of a general contractor. In arranging to have the painting done by Eichleay, Westinghouse was in fact in no different position than the Atomic Energy Commission; it was dealing with work which was not its primary activity but was instead something which an owner ordinarily would be obliged to have performed as an incident to his continued use of the premises. Since the painting was not shown to be included in the work which Westinghouse ordinarily performed through its own employees, it cannot be deemed to have been a statutory employer of the decedent. The Pennsylvania decisions which use language describing the regular business of a defendant as including whatever obligation he assumed by contract, and which are sometimes cited for this proposition, do not on analysis sustain such a broad rule. What they decide is that in order for the statutory employer relationship to exist there must be a triangular contractual relationship, involving an owner, a principal contractor and the latter's subcontractor,[6] and even sub-subcontractor,[7] and that where there is simply a two-party relationship and the subcontractor is an independent contrac-

6. See McDonald v. Levinson Steel Co., supra; McGrath v. Pennsylvania Sugar Co., supra.

7. See Qualp v. James Stewart Co., supra.

tor, then it is excluded from the statutory employer provision of § 203 by § 105 of the Act dealing with independent contractors.[8]

Courts must be careful not to enlarge beyond its proper limits the statutory employment relationship, out of consideration for the injured employee's right to workmen's compensation. For we must recognize that although the Workmen's Compensation Act was designed to provide compensation to employees for their injuries without regard to the negligence of their employer, the statutory employer provision has come increasingly to be used as a shield to avoid heavy negligence recoveries against remote parties who have contracted with the injured workman's immediate employer. See McSparran v. Hanigan, 225 F.Supp. 628, 635 (E.D.Pa.1963), aff'd, 356 F.2d 983 (3 Cir. 1966).

We need not, however, rest our decision on the ground that Westinghouse would not be the statutory employer even if decedent was engaged in an activity which had been imposed on it by its contract with the Atomic Energy Commission, because the activity was not part of Westinghouse's regular business. For the record does not require a finding that the activity in which decedent was engaged was in fact part of Westinghouse's obligations under the contract with the Atomic Energy Commission.

■ The two provisions upon which Westinghouse most strongly relies are inconclusive. Article IX, § 2a,[9] which deals with the duty of Westinghouse to protect the government property from loss or damage, requires it only to take "all reasonable measures" to do so, but even this is limited to following "acceptable regulations and * * * policies and procedures" mutually agreed upon by Westinghouse and the Atomic Energy Commission. No such regulations or policies or procedures have been shown. The section then goes on to provide that in the absence of such standards, Westinghouse should act "in accordance with sound industrial practice to protect [the government property] from loss or damage." It provides further that Westinghouse "shall, subject to the provisions of Section 5 of this Article IX, keep in good operating condition and repair all such government property." Section 5 of Article IX modifies this last requirement by exempting Westinghouse from all loss or damage which does not result from its willful misconduct or lack of good faith. This, of course, suggests a narrower duty than might otherwise be imposed by Article IX, § 2a. In any event, Westinghouse introduced no evidence to prove whether the painting in question was "in accordance with sound industrial practice," or was required in order to keep the premises "in good operating condition and repair." What testimony there is relating to the purpose behind the painting is fragmentary. William Yancura, an employee of Eichleay, testified that the purpose of painting the ceiling was "just to clean it." Elmer Hlavaty, Westinghouse's safety engineer, testified that the painting was part of a "facilities improving program, in which we were trying to upgrade our facility and make the areas much nicer due to housekeeping." Paul Rolich, Eichleay's superintendent under the subcontract with Westinghouse, testified that the effect of painting the ceiling would be one of "housekeeping, maintenance." The sparsity of the evidence relating to the purpose for which the painting was performed and the absence of evidence as to whether it was in accord with sound industrial practices or was required in

---

**8.** "The term 'contractor,' as used in article two, section two hundred and three, and article three, section three hundred and two (b), shall not include a contractor engaged in an independent business, other than that of supplying laborers or assistants, in which he serves persons other than the employer in whose service the accident occurs, but shall include a subcontractor to whom a principal contractor has sub-let any part of the work which such principal contractor has undertaken." Act of June 2, 1915, P.L. 736, art. I, § 105, 77 Purdon's Pa.Stat.Annot. § 25.

**9.** Quoted in note 1, supra.

order to keep the premises in good operating condition and repair, as Westinghouse's contract required, forbid us from rejecting the jury's conclusion that Westinghouse was not the statutory employer of decedent.

The judgment of the district court will be affirmed.