Gilbert SPRINGER, Plaintiff,

v.

UNITED ENGINEERS AND CONSTRUC-TORS, INC., Defendant and Third-Party Plaintiff,

v.

BABCOCK & WILCOX COMPANY, a cor-poration, Third-Party Defendant.

Civ. A. No. 64-344.

United States District Court
W. D. Pennsylvania.

Sept. 22, 1967.

Donald W. Bebenek, Meyer, Darragh, Buckler, Bebenek & Eck, Pittsburgh, Pa., for defendant United Engineers and Constructors, Inc.

John E. Evans, Evans, Ivory & Evans, Pittsburgh, Pa., for plaintiff Gilbert Springer.

Giles J. Gaca, Pringle, Bredin, Thomson, Rhodes & Grigsby, Pittsburgh, Pa., for third-party defendant Babcock & Wilcox Co.

OPINION

DUMBAULD, District Judge.

Plaintiff, an employee of Babcock & Wilcox (hereinafter called B & W), was injured on May 13, 1963, by being hit by a falling object from above while doing welding on a "clear well tank" (Tr. 68-69). This is a tank which supplies distilled water for a steam generator (Tr. 74). The tank was bought by

Pennsylvania Power and Light Company (Tr. 97) and was being installed by B & W pursuant to an agreement with defendant United Engineers and Constructors, Inc. (hereinafter called U E) (Tr. 71, Ex. F.).

The Power Company was adding a fifth unit for generation of electricity at its plant near New Castle. It chose to do this work by using the services of a general contractor, U E, for a total contract price of $5,050,000.00 (Ex. B). The contract with U E became effective on May 15, 1962.

Previously thereto, doubtless in order to take advantage of its bargaining power as a large user of electrical machinery and equipment, it had entered into various other contracts with other suppliers. These arrangements might be described as options. If the general contractor U E saw fit, these contracts were to be assigned by the Power Company to U E, who would enjoy the benefit of the bargains made with the Power Company (Ex. B, Par. 2C).

One of the contracts thus assigned (Ex. C; Tr. 23, 29) to U E was one with Babcock & Wilcox for erection of the steam generator (commonly called a boiler) (Ex. A). This contract, adoption of which by U E was mandatory under its general contract with the Power Company (Ex. B, Par. 2D), went into effect on May 8, 1962. The assignment was signed by all three parties, thus effecting a novation, apparently as of Nov. 4, 1962. Assignment of the boiler contract was contemplated *ab initio* under its terms (Ex. A, Par. 1A).

The boiler contract did not cover the "clear well tank", but since B & W had workmen represented by the boilermakers' union on the premises (Tr. 72–74), U E decided to have B & W do the work on the tank, pursuant to a separate arrangement (Ex. F). The work on the tank was part of the general undertaking covered by U E's contract with the Power Company to construct the fifth unit for the sum of $5,050,000.00 (Ex. B). U E paid B & W and was reimbursed out of the $5,050,000.00 from the Power Company (Tr. 70, 80).

For administrative purposes in the "battle of forms" U E handled the clear well tank construction as a "change order" (No. 2, Ex. F) dated December 5, 1962 (and accepted by B & W apparently on or about that date) in connection with the boiler contract (Ex. A), adding the price of the clear well tank work ($65,000.00) to the price of the boiler work (Tr. 51–52).

But erection of the clear well tank was not part of the work which B & W obligated itself to perform when it entered into its original contract (Ex. A) to erect the boiler. The consideration of $65,000.00 specified in change order No. 2 was separately negotiated for the work on the clear well tank.

The case is now before us on defendant's motion for summary judgment, upon evidence received at a hearing on August 16, 1967, pertinent parts of which are referred to hereinabove.

Defendant U E contends that it is a "statutory employer" of plaintiff under the Pennsylvania Workmen's Compensation law, 77 P.S. § 52, which reads as follows:

"An employer who permits the entry upon premises occupied by him or under his control of a laborer or an assistant hired by an employe or contractor, for the performance upon such premises of a part of the employer's regular business entrusted to such employe or contractor, shall be liable to such laborer or assistant in the same manner and to the same extent as to his own employe."

█ This provision was designed to extend relief by way of compensation to employees of subcontractors, but has been used by general contractors to avoid tort liability. This is legitimate, as exemption from common law liability is conferred *pari passu* with extension of statutory liability.

The tests defining applicability of the statutory employer doctrine have been well set forth in the following cases:

Qualp v. James Stewart Co., 266 Pa. 502, 503, 507–509, 109 A. 780 (1920); McDonald v. Levinson Steel Co., 302 Pa. 287, 295, 153 A. 424 (1930) [laying down five points]; Jamison v. Westinghouse Electric Corp., 375 F.2d 465, 467–468 (C.A. 3, 1967); Stipanovich v. Westinghouse Electric Corp., 210 Super. 98, 100–101, 231 A.2d 894 (1967).

We are here chiefly concerned with the fourth criterion,[1] whether part of the general contractor's business (or obligation to perform work) was entrusted to a subcontractor.

From what has been said above, it seems clear that defendant U E was a general contractor, being specifically designated as such in its own contract with the Power Company. Moreover, the contract of B & W with the Power Company expressly contemplated that there would be such a general contractor subsequently designated.

It is clear also that construction of the clear well tank was part of the work undertaken by U E in its contract; and was not a part of the work undertaken by B & W in its original contract of May 8, 1962 (Ex. A).

It is clear also that this work was afterwards entrusted by U E to B & W under a subsequently negotiated agreement.

■ That B & W thereby became a subcontractor is not negated by the two circumstances upon which plaintiff relies: (1) that U E for bookkeeping purposes embodied the clear well tank agreement in a so-called "change order" and assigned to it a reference number used by U E for all its dealings with B & W, including the original boiler contract; (2) that B & W should be considered an "independent contractor" because it became liable under the boiler contract *before* U E became general contractor. It seems clear that after the general contract was executed, and an assignment of the boiler contract was assented to by all three parties, there was a novation, and that thereafter the status of U E was that of general contractor and the status of B & W was that of subcontractor (even with respect to the boiler work, and *a fortiori* as to the clear well tank work which was subsequently agreed upon).

The technique employed by the Power Company of entering into preliminary contracts, with the declared expectation of subsequently assigning or cancelling them, seems to be a legitimate mode of establishing predetermined cost ceilings on significant portions of the total job.

It is simply a device like the use of a holding company or collapsible corporation, and if it results in abuse the remedy is to be found in legislative regulation, as occurred in the case of those devices.

Use of such preliminary contracts does give the impression, upon superficial observation, that the owner is himself making independent contracts covering particular portions of the total job; but when the preliminary contracts themselves provide for subsequent assignment and announce the intention of subsequently employing the services of a general contractor, and when subsequently such intentions are in fact executed, there seems to be no reason why use of the preliminary contracts should preclude the owner from the advantages to be derived from use of a general contractor to handle the entire job.

Accordingly, the motion for summary judgment must be granted.

---

1. Plaintiff also bases an argument on the second test, control of the premises. But it seems plain that such control was annexed to the performance of the work to be done, and that the relationships of the parties with respect to their respective contractual responsibilities were unaffected by the fact that the Power Company continued to generate electricity during the construction work.